[No. H037099. Sixth Dist. Dec. 13, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEXANDER JAVIER JASSO, Defendant and Appellant.

## Counsel

Jeffrey A. Glick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Catherine A. Rivlin and Allen R. Crown, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

MÁRQUEZ, J.—A jury convicted defendant Alexander Javier Jasso of attempted murder and other crimes arising from his shooting at people through a window at a McDonald's restaurant in Prunedale. On appeal he claims that the prosecutor committed misconduct during the trial, that the trial court erred in allowing the jury to hear certain evidence and denying his motion to let the jury visit the crimes' location, that there was insufficient evidence to punish him for his gang promotional activities, and that the trial was unfair when viewed as a whole.

We disagree and will affirm the judgment.

### PROCEDURAL BACKGROUND

The jury convicted defendant of attempting to commit the first degree murder (Pen. Code, §§ 187, subd. (a), 189, 664)[1] of Alejandro Múñoz (Múñoz). The jury also convicted him of three counts of assault with a semiautomatic firearm (§ 245, subd. (b)) and one count each of willfully and

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

maliciously shooting at an occupied building (§ 246) and gang-related street terrorism (§ 186.22, subd. (a)). The amended information had also charged him with the attempted first degree murder of Rafael Múñoz Flores (Flores), but the jury acquitted him of that charge.

The jury found true various enhancement or alternate penalty scheme allegations: that defendant committed all of the offenses except the gang-related street terrorism crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)),[2] that in all of the offenses except the section 246 violation he personally used a firearm (§ 12022.5, subd. (a)),[3] and, with respect to his attempted murder conviction, that he intentionally discharged a firearm (§ 12022.53, subd. (c)). The trial court sentenced him to 35 years to life imprisonment.

## FACTS

### I. *Prosecution Case*

The prosecution presented the following facts at trial. On the night of March 29, 2009, defendant, accompanied by his girlfriend Tara Meehan and his friend Robert Hornbeak, drove to a McDonald's restaurant in the Monterey County town of Prunedale. Defendant looked toward the well-lit interior of the restaurant and saw Múñoz and his brother Flores. Defendant was a member of the Norteño criminal street gang and recognized Múñoz as a member of the Sureño criminal street gang. He recognized Múñoz personally; in addition, Múñoz was wearing a blue sweatshirt, and blue is a color that Sureño gang members use to identify themselves.

Defendant reacted negatively to Múñoz's presence. Hornbeak wanted him to ignore Múñoz and let the car's occupants get something to eat elsewhere, but defendant, according to Hornbeak's testimony, said, "I'm gonna get this fool" or "I gotta get this guy." Defendant maneuvered his large vehicle out of the restaurant's drive-through lane, circled around in the parking lot, and parked by one of the restaurant's windows. He racked the slide of a gun he had in the car and fired one shot. It passed through the restaurant window, causing Múñoz, Flores, and a woman identified in court as Jane Doe to duck or drop to the floor. The restaurant manager, who was Múñoz's wife, called 9-1-1. She would later identify defendant as the vehicle driver in a photographic lineup and in court.

---

[2] The information did not allege the gang-benefit enhancement with regard to the gang-related street terrorism charge. This may be because section 654 forbids double punishment on the substantive crime (§ 186.22, subd. (a)) and the enhancement (*id.*, subd. (b)) in any event. (*People v. Louie* (2012) 203 Cal.App.4th 388, 391–392, 400–402 [136 Cal.Rptr.3d 646].)

[3] This finding caused the relevant convictions to constitute serious felonies (§ 1192.7, subd. (c)(8)) and violent felonies (§ 667.5, subd. (c)(8)) by operation of law.

Sheriff's deputies arrested defendant at his residence. On the premises they found a gun, which was hidden in defendant's bedroom. The deputies also found a quantity of ammunition in the bedroom. They did not find defendant's vehicle on the premises, but found it a few days later on property on which a friend lived. It was "away from everything, out of sight" behind a tree and concealed by a tarpaulin and plywood sheets.

A criminalist who testified as an expert on firearms answered yes to the prosecutor's question whether the bullet recovered from the crime scene was in "very poor condition." The authorities did not attempt to match it to defendant's gun. The expert testified that the gun could not be fired until its slide had been pulled back to chamber a round. Because of a missing part, the gun could be fired with about one-third of the normal trigger pulling force needed. The "harder trigger pull [is] a safety measure," he explained, but this gun lacked the needed part. As a result, some 4.25 to 4.5 pounds per square inch of pulling force would discharge the weapon, whereas ordinarily about 12 pounds per square inch would be required. In general, however, the gun worked normally, and it was of "reasonably high quality."

Because defendant was the subject of a gang-related charge and numerous gang-related allegations, the prosecution presented evidence of his ties to the Norteño gang. A witness qualified as an expert in street gangs generally and the Norteños in particular testified that gangs like the Norteños have an honor-based culture and thus prize displays of dominance over other similar gangs and, conversely, take harshly to insults or other acts that they perceive as demeaning to them. The Norteños' archrival is the Sureño criminal street gang. The Norteños use certain motifs to identify and promote the gang. These include the number 14, the color red, the logos of the San Francisco Giants professional baseball team, and the iconic *huelga* eagle that is the symbol of the United Farm Workers agricultural labor union. (*Huelga* is Spanish for a labor strike.) Norteños also use tattoos and hand gestures to identify themselves and to intimidate or ward off other gangs.

Defendant bore a one-dot tattoo on one arm and a four-dot tattoo on the other, registering his identification with the Norteños' favored number 14 (the letter "N" is the 14th letter of the alphabet). In his bedroom sheriff's deputies found a red blanket with the logo of the San Francisco 49ers professional football team, red bandanas, a T-shirt with the *huelga* eagle, and CD-ROM covers with the title "Northern Cali Killas" (Cali being an abbreviation of California), and a man in red holding an Uzi machine gun. A cap modeled on the uniform of the New York Yankees professional baseball team was red instead of the Yankees' traditional blue. A San Francisco Giants cap was white with red letters instead of the Giants' traditional black and orange. Hornbeak testified that he was making prideful Norteño gestures to Múñoz

and Flores before defendant fired his shot, and that Múñoz and Flores were laughing at Hornbeak for doing so.

Inside defendant's vehicle, sheriff's deputies found CD-ROM covers with the words "Northern Exposure," the *huelga* eagle, and one dot followed by four dots. According to the testimony of a sheriff's department detective, the CD-ROMs featured the performances of gang-associated musicians who performed music listened to by Norteño gang members. The friend who was hiding defendant's vehicle for him was dressed in a red shirt and red tennis shoes with red shoelaces when the deputies went to the property. The same detective testified that as he prepared to book defendant into jail, defendant "told me he was a Norteño" for the jail's housing assignment purposes.

The prosecution's expert witness on gangs testified that in his opinion defendant was an active member of the Norteños. The witness testified that defendant, despite his youth, had a long history of associating with the Norteños in various parts of California and that he was an active Norteño on the day of the crimes. He also testified that defendant fired the shot in the direction of Múñoz and Flores to promote the Norteños' interests.

Questioned by sheriff's investigators following his arrest, in an interview that was recorded and played for the jury, defendant acknowledged that his gun discharged toward Múñoz and Flores, but insisted that he fired it "accidentally" and did not intend to shoot at anyone. He claimed that he did not rack the gun's slide to load a round into the chamber for firing. Defendant was acquainted with Múñoz and did not like him but "wanted [only] to fight him . . . [and] not shoot him" after seeing him at the restaurant. He denied making any gang gestures toward Múñoz and Flores.

II. *Defense Case*

The defense presented the following facts at trial, at which defendant testified on his own behalf.

Before defendant shot at Múñoz, the two exchanged insults outside the restaurant, although they were not gang-related. Nor did the two exchange gang signals. However, defendant knew that "they called him [(Múñoz)] a southerner," meaning a member of the archrival Sureño street gang. Defendant parked his vehicle and could see Múñoz, who was now inside the restaurant. Defendant and Hornbeak, still in defendant's vehicle, gestured to Múñoz to come outside, and Múñoz, who was seated and talking on a telephone, started laughing at defendant. "I got kind of mad," defendant testified, and so, in what was "the worst mistake of my life," "I got the weapon" "to show it to him," meaning Múñoz. Defendant did this to "kind of

fit in, to look tough." "It went off," defendant testified, but "I never meant for a bullet to be fired from that weapon." "If I wanted to kill him, I could have kept shooting." Defendant did not pull back the gun slide to chamber a round, so Hornbeak—who said he heard a semiautomatic gun being cocked from the area of the driver's seat—must have misinterpreted the sound. Nor did defendant tell Hornbeak that he intended to "get this guy," in the words of the prosecutor during cross-examination.

The reason defendant took his vehicle to another location, some three to four days later, was to have his friend's father fix a damaged bumper.

Defendant admitted to being a Norteño gang member "[a]t one point" and retaining a degree of interest in the Norteños' lifestyle and imagery, as shown by the paraphernalia found at his residence and in his car (although he associated the *huelga* eagle with the late César Estrada Chávez, the well-known labor leader who cofounded the United Farm Workers union, rather than with the Norteños); he had called himself a Norteño earlier in his life. But he denied being actively involved with any gang after "maybe [age] 17 at the latest."[4] For example, he acquired his Norteño dot tattoos at age 14, and only to be "cool." Even when he considered himself an active Norteño, his activities consisted of "just girls, weed, and partying," but not gang-related crimes. He might own more blue clothing than red and in general he had "real plain tastes, so I'm used to wearing . . . black shirts or white shirts and just regular jeans." He also denied identifying himself as a Norteño during his jail booking. Instead, he had requested to be placed with the general population and not with the separate housing set aside for Norteños. In addition, he admitted to having juvenile delinquency adjudications and juvenile probation violations, and he acknowledged that a juvenile court judge had once imposed a gang-related probation condition "telling me that I had to stop hanging around with the group of friends that I [had]."

Defendant did not consider his friend Hornbeak to be a Norteño, but he knew, and for a while had associated with, at least five people in Monterey County whom he considered to be gang members or probable gang members. He obtained his gun in Visalia (Tulare County) "for protection" and ammunition for it because he had once been shot at in Prunedale and, regarding the gun itself, because "I thought it was cool" to have it.

Defendant was evasive in answering his lawyer's question whether his being fired upon had happened only shortly before his own gunplay at the restaurant, but he admitted that "it wasn't that long" beforehand. He further testified on direct examination that he told the sheriff's department detective

---

[4] Defendant was 18 years old when he fired the shot into the restaurant.

who questioned him that he and the victim were rival gang members, and in his testimony he implied that he believed the victim was a Sureño: "I have some friends that . . . live by him, so they know him real well" and "[t]hey said that he might be a southerner." He amplified that he and the victim "just didn't like each other," and this was so "because a friend of mine that lives right next to him . . . has problems with him." He also testified that he had fired the gun before the fateful encounter at the restaurant and that it had not discharged accidentally before.

Hornbeak testified that he and defendant went to a residence after the shooting. Defendant handed him the gun but it started to fall from Hornbeak's grasp. Hornbeak squeezed the trigger inadvertently and the gun discharged. Hornbeak did not testify about the amount of gripping strength it took for this accident to happen.

## DISCUSSION

### I.  *Claim of Repeated Instances of Prosecutorial Misconduct*

Defendant claims that the prosecutor repeatedly committed misconduct during his closing argument to the jury, in violation of state law and the due process guaranty contained in the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, defendant asserts that the prosecutor, over defense counsel's repeated objections and despite admonitions from the trial court, committed misconduct as follows:

1. The prosecutor repeatedly stated that high-ranking California courts had found defendants guilty under facts similar to those here and implied that their decisions were a warrant for the jury to do the same.

2. The prosecutor improperly tried to shift the burden to defendant to prove that he fired the gun accidentally.

3. The prosecutor implied that, after speaking with his lawyer, defendant confabulated an account that he fired the gun accidentally. "This injected defense counsel's veracity and character into the trial, and denigrated [the defense lawyer] by implying he helped fabricate evidence." And the prosecutor made the same insinuation regarding accounts of how defendant obtained the gun.

■  " ' "The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the

conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] . . . [W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Carter* (2005) 36 Cal.4th 1215, 1263 [32 Cal.Rptr.3d 838, 117 P.3d 544].)

Despite our quotation of this strong and morally freighted language, containing such adjectives as "intemperate," "reprehensible," "egregious," and "deceptive," the concept of "prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].) No "showing of bad faith is required to establish prosecutorial misconduct in argument to the jury." (*Ibid.*, italics omitted.) Thus, the rubric of prosecutorial misconduct embraces a prosecutor's inadvertent and negligent objectionable statements to the jury as well as misstatements involving mental states more culpable than negligence.

The prosecutor's closing arguments contained a number of unorthodox assertions:

1. The prosecutor repeatedly stated that the California Supreme Court and the California Court of Appeal had upheld guilty verdicts on facts similar to those before the jury;

2. The prosecutor implied that the case was not worth the bother of trying because it was open-and-shut, and that trying it was merely a formality legally required to obtain convictions that defendant obviously merited;

3. The prosecutor told the jurors that if any member of the jury failed to follow his or her oath, and, specifically, if a fellow juror failed to deliberate to the other jurors' satisfaction, the dissatisfied jurors must report it to the trial court; and

4. The prosecutor argued to the jurors that because "the case continues to be investigated through trial" and the evidence now showed a charge of attempting to murder a third person, a customer at the restaurant, to be baseless, they should return a verdict of not guilty on that charge. This came as a surprise to the trial court, which mentioned during a break in the prosecutor's argument that it had "denied . . . the motion to dismiss, under

[section] 1118.1"—i.e., defendant's motion for judgment of acquittal on that charge. The court granted a renewed motion to dismiss under section 1118.1, removing the question from the jury's consideration.

### A. *Presence or Absence of Prosecutorial Misconduct*

#### 1. *Argument That Higher Court Decisions Counseled Defendant's Guilt*

We first consider the prosecutor's statements that the California Supreme Court and California Court of Appeal had upheld guilty verdicts on facts the prosecutor viewed as comparable to those of this prosecution.

The prosecutor first argued: "The Defendant shot a gun at human beings who were in an occupied McDonald's restaurant. The shooting alone, by itself, clearly proves the intent to kill Alejandro [Múñoz] and Rafael [Flores]. Just that shooting alone. I'm not just saying that, the California Supreme Court says this. It says that the act of purposely firing a gun at another human being, at close range, provides the inference that the shooter acted with the intent to kill. The shooting alone proves the Defendant's intent. That's it. [¶] The Defendant's shooting into an occupied McDonald's at Alejandro and Rafael, proves his intent, proves that he wanted to kill Alejandro and Rafael. That's a low [*sic*]."

Soon afterward, the prosecutor argued:

"[H]e pulled that trigger while that gun was pointed at Alejandro and Rafael. That proves intent to kill.

"One shot, two victims, equals attempted murder. Based on the evidence that we had, that is enough. One shot, two victims, that's attempted murder for both those victims. [The] Supreme Court said, intent to kill two different victims can be inferred from evidence that the Defendant fired a single shot at the two victims, both of whom were visible to the Defendant. That's what we have here.

"Another, appellate—California appellate court said: Defendant's act of firing a .22 caliber rifle, toward a victim, from approximately 20 yards away, and in a manner that could have inflicted a mortal wound, had the bullet been on target, was sufficient to support an inference of intent to kill. The fact that the defendant was unsuccessful in killing the victim, or abandoned his efforts after one shot, did not mean that he lacked the requisite intent. Kind of sums it up right there."

Defense counsel did not object to these remarks when the prosecutor made them. During a break in the prosecutor's argument counsel stated, outside the jury's presence: "Judge, I wanted [*sic*] to make an objection, at this time, and, move for a mistrial, based on counsel's referring to the Supreme Court and the courts of appeal, and stating language from those cases, as if they are part and parcel of this case. And I didn't object at the time. [¶] It just caught me by surprise . . . ."[5]

The trial court responded to the mistrial motion at length. It acknowledged that "the Court's opinion of that has always been that those are the type of discussions that should take place at the time of instructions," and stated that it found this aspect of the prosecutor's argument surprising, but it denied the mistrial motion, concluding that the prosecutor's remarks were novel but ultimately dismissing the objection with the remark, "You learn something new every day."

The parties did not cite any case, and we have found almost no case anywhere in the United States, that directly and substantively addresses the type of remarks the prosecutor made to the jury.

We recognize that in *People v. Rich* (1988) 45 Cal.3d 1036 [248 Cal.Rptr. 510, 755 P.2d 960], our Supreme Court "fail[ed] to see how [a prosecutor] committed misconduct by reading this passage" (*id.* at p. 1092) to the jury: " 'Our Supreme Court at one time made a statement about the felony murder rule which I think is appropriate. "The statute was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker . . . ." ' " (*Ibid.*)

But *Rich* is distinguishable because the prosecutor there did not attempt to apply a legal principle to facts in the way that the prosecutor here did. He only enunciated a legal principle. Here, by contrast, the prosecutor counseled the jury that higher-level legal institutions had considered *facts* similar to those here and applied the law to those facts in ways not favorable to criminal defendants.

---

[5] "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety." (*People v. Carter, supra*, 36 Cal.4th at p. 1263.) Defense counsel's objection, though not immediate, was timely, because it came in time for the trial court to cure any harm made by the remarks. Hence, this is not a case in which a "defendant . . . forfeited his appellate claims of prosecutorial misconduct . . . by failing to object on those grounds in the trial court and by failing to seek an admonition to cure any harm caused by the alleged misconduct." (*People v. McDowell* (2012) 54 Cal.4th 395, 436 [143 Cal.Rptr.3d 215, 279 P.3d 547].) Thus, we need not address defendant's contingent claim that if counsel's objections were not timely, then he rendered ineffective assistance of counsel. Defense counsel fully protected defendant's rights with respect to the instances of alleged prosecutorial misconduct he identifies on appeal.

In *Rich*, moreover, the appellant complained of the prosecutor's act "without explanation" (*People v. Rich, supra*, 45 Cal.3d at p. 1092) of why it might constitute misconduct and the Supreme Court dismissed the claim in a perfunctory manner, as it has done in other death penalty cases presenting myriad claims. (*People v. Myles* (2012) 53 Cal.4th 1181, 1223, fn. 16 [139 Cal.Rptr.3d 786, 274 P.3d 413] ["a matter asserted in a perfunctory manner is not properly raised"]; *People v. Smith* (2003) 30 Cal.4th 581, 616, fn. 8 [134 Cal.Rptr.2d 1, 68 P.3d 302] ["We need not consider such a perfunctory assertion unaccompanied by supporting argument."].) The Supreme Court's riposte appears in a number of capital cases, in which the appellant's opening brief may be the size of a telephone directory and present a panoply of claims, some of which may be presented solely to preserve the defendant's access to review in the federal courts. (See *People v. Tully* (2012) 54 Cal.4th 952, 1075 [145 Cal.Rptr.3d 146, 282 P.3d 173].) Because our Supreme Court did not provide detailed reasons for rejecting the perfunctory claim in *Rich*, we think it fair to construe the decision narrowly.

For the foregoing reasons, we do not find *Rich* dispositive of this case. Because it is not, we must look to other court decisions to guide us further in addressing defendant's claim.

Our Supreme Court has disapproved of a prosecutor's closing argument that included a statement by the late United States Supreme Court Justice Byron White, in a dissenting opinion, that prosecutors are obliged to present the truth to juries but defense counsel are not. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 59–61 [14 Cal.Rptr.2d 133, 841 P.2d 118]; but see *People v. Carter, supra*, 36 Cal.4th at p. 1265 [declining to criticize a prosecutor for quoting Justice White on this point].) In *Hawthorne*, the court warned: "The trial court should not have sanctioned the prosecutor's comments. The closing statements of counsel should relate to the law and the facts of the case as each side interprets them. Whether or not attributed, the views expressed in Justice White's dissent interject an extraneous generalization, potentially diverting the jury's attention from the specifics upon which they must focus." (*Hawthorne, supra*, at p. 60.)

*Hawthorne* found the prosecutor's action harmless. (*People v. Hawthorne, supra*, 4 Cal.4th at p. 61.) *Hawthorne*, however, may be distinguishable with regard to prejudice, because the prosecutor's remarks in that case amounted to a jibe at defense counsel and not an implication that the California courts would expect the jurors to find defendant guilty under the evidence presented.

In *Prieto v. Adams* (E.D.Cal., Nov. 22, 2011, No. 2:10-CV-750-JAM TJB) 2011 U.S.Dist. Lexis 134980, a United States District Court magistrate considered a California state prisoner's petition for writ of habeas corpus.

The prisoner, representing himself, argued that the prosecutor committed misconduct when he told the jury: "I want you to see how the law treats the idea of natural and probable consequences. And this is based on a fact situation that is somewhat similar, but not quite. . . . [¶] . . . . [H]ere is the word of the Supreme Court. . . . '[T]he nature of modern gang warfare is quite different. When rival gangs clash today verbal talking quickly give way to physical violence and gunfire. No one immersed in gang culture is [un]aware of this reality. And we see no reason the Courts should turn a blind eye to this. Given the great potential for escalating violence during gang confrontation it is immaterial whether one gang member specifically knew another gang member had a gun.' [¶] The words of our Supreme Court. In that case it was the same idea. The defense will say, I didn't know he had a gun. We were just going there to fight. The Supreme Court said in that same situation things have changed, ladies and gentlemen." (2011 U.S.Dist. Lexis 134980 at pp. *18–*20.)

The magistrate in *Prieto* recommended to the district judge that the prisoner's claim not be considered on the merits. The prisoner's claim was a narrow one: he discerned misconduct in the prosecutor's invocation of the California Supreme Court, because the prosecutor was reading from a less authoritative California Court of Appeal case, namely *People v. Montes* (1999) 74 Cal.App.4th 1050 [88 Cal.Rptr.2d 482] (see *id.* at pp. 1054–1056). The magistrate opined that counsel had not rendered ineffective assistance for failing to object. (*Prieto v. Adams, supra,* 2011 U.S.Dist. Lexis 134980 at pp. *27–*29.)

The foregoing cases provide useful analogies or information, but the closest case we have found is an Indiana case called *Fritz v. State* (1926) 198 Ind. 229 [153 N.E. 408]. There, "the prosecuting attorney was permitted, over [the defendant's] objection, to read to the jury and comment upon the opinion of the [Indiana] Supreme Court reversing the judgment in a former appeal of this identical case." The Indiana Supreme Court concluded that this statement by the prosecutor "would present a very serious question if it were properly brought to our attention." (*Ibid.*) But the court found the claim to be procedurally barred and declined to consider it on the merits. (*Ibid.*)

Defendant here argues that the prosecutor "improperly inject[ed] additional facts purportedly within his knowledge into the case, and usurp[ed] the court's function to instruct the jury on the law, and the jury's function to apply that law to the facts it determined." He is correct that the remarks ran the risk of committing the usurpation he discerns. The California Supreme Court and the California Court of Appeal are, respectively, the highest and second-highest echelons of the state court system. The prosecutor erred in invoking their authority. He should not have invoked the authority of any

court that one or more jurors could surmise outranks the trial court. A fortiori, he should not have implied that the California Supreme Court would expect the jury to return a guilty verdict. This he did when he said: "The shooting alone, by itself, clearly proves the intent to kill Alejandro [Múñoz] and Rafael [Flores]. Just that shooting alone. I'm not just saying that, the California Supreme Court says this. It says that the act of purposely firing a gun at another human being, at close range, provides the inference that the shooter acted with the intent to kill. The shooting alone proves the Defendant's intent. That's it."

Although, as noted, we have found scant authority on this matter, we regard this problem as similar to the misconduct disapproved in *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (*Caldwell*). In *Caldwell*, "a prosecutor urged the jury not to view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the State Supreme Court." (*Id.* at p. 323.) The prosecutor told the jury that " 'your decision is not the final decision' " (*id.* at p. 325) because it " 'is automatically reviewable by the [Mississippi] Supreme Court' " (*id.* at pp. 325–326). *Caldwell* held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Id.* at pp. 328–329.)

In sum, "*Caldwell* error occurs . . . when the remarks to the jury concerning its role in the sentencing process are inaccurate or misleading in a way that allows the jury to feel less responsible than it should for the sentencing decision." (*People v. Elliott* (2012) 53 Cal.4th 535, 556 [137 Cal.Rptr.3d 59, 269 P.3d 494].) Our own Supreme Court reached the same conclusion many years before *Caldwell*. In a case that also considered capital jury sentencing verdict issues, the court stated that "argument misinform[ing] the jury as to the power of this court" (*People v. Morse* (1964) 60 Cal.2d 631, 650 [36 Cal.Rptr. 201, 388 P.2d 33], italics omitted) presents the risk that jurors would believe the high court "could substitute its judgment" (*ibid.*) for the jury's.

In this case, the risk is rather that jurors might believe the high court had already done the jury's work and made the jury's choice for it. Their commonality lies in the risk of telling the jury that its role is less significant than it is: in *Caldwell* because the Mississippi Supreme Court would reassess any decision the jury made to impose a death sentence, and here because the California Supreme Court or the California Court of Appeal would expect the jury to find defendant guilty under the facts the prosecution had presented.

*Caldwell*'s holding was narrow inasmuch as the court's analysis rested on Eighth Amendment considerations that apply to the death penalty. (See *Caldwell, supra*, 472 U.S. at pp. 329–330.) The same may also be true of *People v. Morse, supra*, 60 Cal.2d 631. Nevertheless, along with the main parallel between those cases and this one, other observations that the *Caldwell* court made also apply to the situation before us.

*Caldwell* mentioned the obvious: "jurors often might not understand" "the institutional limits on what an appellate court can do." (*Caldwell, supra*, 472 U.S. at p. 330.) The jurors here may have thought that appellate courts are allowed to reverse jury verdicts of acquittal or are allowed to send messages telling juries what to do in particular cases.

*Caldwell* identified another risk: that a jury "might . . . wish to 'send a message' of extreme disapproval for the defendant's acts." (*Caldwell, supra*, 472 U.S. at p. 331.) Again, *Caldwell* had in mind the decision whether to impose a death sentence, but the point remains valid in any case in which prosecutorial remarks create a risk that the jury will conclude that a high court is assuming some responsibility for the jury's decision. A witness testified in this case that there were some 6,000 Norteños in Monterey County and "in the neighborhood of" 120,000 Norteños or Norteño associates in northern California. Those are alarming and probably surprising statistics, which the witness soon followed by explaining that the Norteños' crimes include "robbery, carjacking, murder, weapons [possession], narcotic sales, identity theft, [and] kidnapping." Such dramatic testimony could help nudge jurors toward embracing the prosecutor's argument for convicting defendant even if they had misgivings about the state of the evidence, if they felt that the verdicts to be rendered had already been settled to some extent by the California Supreme Court or Court of Appeal.

The foregoing risk was made all the greater by the prosecutor's remark, in effect, that the state was just going through the motions in trying defendant because the case against him was so strong. He said, "We are here because the Defendant has this right to this process. And it's a right that everybody in this country has, and it's a right that should never be given up. And that is the only reason we are here, because he has this right." He reiterated shortly after the foregoing remark that "the only reason he was here [*sic*], is just because the Defendant has this right. The Defendant also has a right to an attorney . . . . [Defense counsel] is a very good attorney, and he's done the best he can . . . with this case. But the fact is, you're only as good as your case. I even admit that as a prosecutor, we're only as good as the facts that we have. This was a very good case. We had a lot of evidence."

Still another risk *Caldwell* identified is that a "capital sentencing jury"— but this may be said of many juries considering serious felony charges—"is

made up of individuals placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice. They are confronted with evidence and argument on the issue of whether another should die"—or, as in this case, another's penal fate short of a death sentence—"and they are asked to decide that issue on behalf of the community. . . . [¶] This problem is especially serious when the jury is told that the alternative decisionmakers are the justices of the state supreme court. It is certainly plausible to believe that many jurors will be tempted to view these respected legal authorities as having more of a 'right' to make such an important decision than has the jury." (*Caldwell, supra,* 472 U.S. at p. 333.) Little more need be added to this observation except that the prosecutor's Remarks about the California Supreme Court and Court of Appeal created similar risks here.

In one respect, the prosecutor's remarks posed a greater risk than did the remarks that *People v. Morse, supra,* 60 Cal.2d 631, disapproved. In *Morse,* the court could take comfort in its reflection that "[w]ords of instruction of the trial judge are more likely to effect prejudice than the words of argument of the prosecutor." (*Id.* at p. 650; see, e.g., *People v. Thornton* (2007) 41 Cal.4th 391, 441 [61 Cal.Rptr.3d 461, 161 P.3d 3].) But that axiom can be carried only so far and remain meaningful. If one or more jurors knew that the California Supreme Court and Court of Appeal outrank the trial court, that axiom would lose its vigor, because they might understand the prosecutor's argument as inviting them to follow higher authority, as he interprets it, rather than the trial court's instructions.

■ In sum, invoking the authority of the higher courts as the prosecutor did constituted error. We will discuss prejudice *post,* at pages 1372–1373, where we conclude that this error was harmless.

### 2. *Argument Regarding Evidence of Accident*

With regard to the burden of proof about defendant's mental state, the prosecutor argued:

"Obviously, you know the defense. It was just an accident. . . . [But] all you're left with is his self-serving, incredible, unreliable, unbelievable statement. That's it. There's no other evidence.

"And when [defense counsel] gets up here and argues to you, you ask for him to fill in this part of it, ask for him to fill this in with the facts, with the evidence that proved that."

Defense counsel moved for a mistrial. The trial court reserved ruling on the objection and invited the prosecutor to "continue on with proper argument."

During a break in the argument and outside the jurors' presence, the trial court denied defendant's motion for a mistrial. The court stated: "The Court is confident that the instructions that have been read to the jury emphasize and repeat, on a number of occasions, the fact that the burden is solely with the Prosecution."

When argument resumed, the prosecutor argued: "[W]e don't have any evidence showing that there's an accident. [¶] There is no issue." "[W]here is the evidence? [¶] Where is the evidence for the column on the right-hand side[?]" The prosecutor was referring to what appears to have been a display in the courtroom that showed the prosecution's summation of the state of the evidence.

Defense counsel again objected and the trial court responded by telling the jurors that "as we have said throughout the trial, . . . the Prosecution has the burden of proving each and every element, in this particular case, which includes intent and all the other elements. The Defense does not need to prove anything in this particular case."

The prosecutor resumed: "Once again, if that evidence was there, if there actually was evidence of an accident, [defense counsel], as good an attorney as he is, would have presented it, but there is no evidence. We [don't] hear any evidence that there was an accident, because it was not there, because it was not an accident." Defense counsel again objected, again unsuccessfully.

■ This comment did not amount to prosecutorial misconduct. There is " '[a] distinction . . . between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' " (*People v. Thomas* (2012) 54 Cal.4th 908, 939 [144 Cal.Rptr.3d 366, 281 P.3d 361].) The former is permissible because a prosecutor generally is permitted to remark on the state of the evidence at closing argument. (E.g., *People v. Weaver* (2012) 53 Cal.4th 1056, 1077 [139 Cal.Rptr.3d 355, 273 P.3d 546].) "[T]he prosecutor may comment ' "on the state of the evidence, or on the failure of the defense to introduce material evidence or call logical witnesses." ' " (*People v. Carter, supra,* 36 Cal.4th at p. 1277.)

Under these principles, the Supreme Court rejected a claim similar to defendant's, including a reference to blanks on a chart, in *People v. Redd* (2010) 48 Cal.4th 691 [108 Cal.Rptr.3d 192, 229 P.3d 101]. There, the prosecutor repeatedly challenged the basis for the defense theory. He remarked: " 'I have a blank paper because I'm not sure exactly what the defense is yet. I'm going to sit here like you and listen to [defense counsel]. I

don't know what he's going to say.' " (*Id.* at p. 739.) Later, the prosecutor jibed that he was " 'waiting to hear what the defense was.' " (*Ibid.*)

*Redd* rejected a claim that the foregoing remarks shifted the burden of proof to the defendant. "[T]he prosecutor's comments merely highlighted his observation that there seemed to be no coherent defense to the charges" (*People v. Redd, supra*, 48 Cal.4th at p. 740), which, although *Redd* did not say so explicitly, was a permissible comment on the state of the evidence.

To be sure, the prosecutor's argument at one point that there was no evidence that defendant's discharge of the gun was accidental was belied by defendant's testimony and his statement to police, in which he maintained he did not intend to fire the gun. But at the outset the prosecutor acknowledged defendant's testimony that the shooting was accidental, while dismissing it as "self-serving, incredible, [and] unreliable." In our view, the prosecutor was arguing that there was no evidence of accident beyond defendant's self-serving statements, including the one that the prosecutor had acknowledged earlier in the argument. There was no misconduct under the circumstances as far as this claim is concerned.

### 3. *Argument About Defense Counsel's Role in the Case*

Defendant's argument that the prosecutor implicitly accused defense counsel of helping defendant change his story in order to render a false account of events also does not rise to the level of prosecutorial misconduct. The prosecutor argued, over defendant's objection, that defendant "wouldn't tell [the authorities] where he got" the gun but then "his attorney comes forward and he says[,] Well, I'd better tell you, I got it from Casper . . . ." He also argued, over defendant's objection, that "[w]e know it wasn't an accident." "[H]e gets up there and tells you on the stand" that he fired the weapon accidentally but "[n]ot once did he say to the police it was an accident. He doesn't say that once."

To the extent that the garbled reference to "Casper" communicated anything to the jury at all, the prosecutor was not accusing defense counsel of encouraging defendant to make false statements, but rather was attempting to comment that defendant changed his story. The same is true of the prosecutor's statement that defendant's claim that he accidentally discharged the gun was a newfound assertion. "The prosecutor did not directly accuse defense counsel of encouraging defendant to lie, but even to the extent the statements swept counsel up in defendant's asserted lies, this was not an improper comment in the context of this case, in which defendant's story changed drastically during trial preparations." (*People v. Rundle* (2008) 43 Cal.4th 76,

163 [74 Cal.Rptr.3d 454, 180 P.3d 224], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

### 4. *Argument That Defendant Never Told Police the Shooting Was Accidental*

At oral argument, counsel for both parties observed that the prosecutor misspoke by arguing that defendant did not tell the police the shooting was accidental, when in fact he did, as the interview transcript shows. As noted, the prosecutor argued, "Not once did he say to the police it was an accident. He doesn't say that once." This was an erroneous description of the evidence and by definition constituted misconduct, i.e., prosecutorial error (*People v. Hill, supra,* 17 Cal.4th at p. 823, fn. 1). Contrary to the prosecutor's statement and as also noted, defendant maintained during the police interview that he did not intend for the gun to discharge and that he fired it "accidentally."

### B. *Prejudice*

As stated, the prosecutor committed misconduct in arguing that the California Supreme Court and the California Court of Appeal had affirmed convictions on facts similar to those of this case and that defendant did not tell the police he discharged the gun accidentally. The prosecutor's actions were, however, harmless under any standard—under that of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], applying to infringement of federal constitutional guaranties, and which requires that the state show that the error was harmless beyond a reasonable doubt, and that of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], applying to errors under state law, in which a defendant must show that there is a reasonable probability that, but for the asserted error, the outcome would have been more favorable to him or her. The case against defendant was strong. There was no obvious reason for defendant to fire a gunshot at another person merely because that individual and a neighbor whom defendant knew did not get along. Rather, the evidence was that defendant, a Norteño street gang member, knew that Múñoz, one of the three victims, was a rival Sureño street gang member. Defendant told his passengers that he was going to confront Múñoz. Instead of entering the restaurant to fight Múñoz, as defendant's self-serving statements about intent would have it, defendant parked his car, looked through the restaurant window at Múñoz and his brother Flores, and fired a round with sufficient accuracy that it penetrated the window, although it failed to wound either man.

The prosecutor's references to higher courts ran the risk of being perceived as conveying instructions that conflicted with those given by the trial court.

This possibility requires us to consider defendant's claim, at least in passing, as one of instructional error, even though the objectionable words came from the prosecutor and not the trial court.

We recognize that there was at one time, and may still exist, a view that even strong evidence can seldom overcome certain types of instructional error for purposes of prejudice analysis—at least those that "effectively prevent the jury from finding that the prosecution failed to prove a particular element of the crime beyond a reasonable doubt." (*People v. Flood* (1998) 18 Cal.4th 470, 491 [76 Cal.Rptr.2d 180, 957 P.2d 869].) Doing so would mean that the reviewing court, not the jury, was assessing the facts of the case and, in effect, improperly trying the defendant, thereby violating the defendant's Sixth Amendment right to jury trial. (*People v. Hagen* (1998) 19 Cal.4th 652, 682 [80 Cal.Rptr.2d 24, 967 P.2d 563] (conc. and dis. opn. of Kennard, J.); *People v. Concha* (2010) 182 Cal.App.4th 1072, 1086, fn. 9 [107 Cal.Rptr.3d 272].)

If we evaluate defendant's claim through the prism of instructional error, we must still find the error harmless, because the California Supreme Court has held that, under United States Supreme Court precedent, sufficiently strong evidence may overcome the aforementioned types of instructional errors for purposes of prejudice analysis. (*People v. Flood, supra,* 18 Cal.4th at pp. 497–503; see *People v. Concha, supra,* 182 Cal.App.4th at pp. 1085–1086.) Thus, the prosecutor's action in referring to the higher courts of California was harmless under *Chapman, Watson,* or *Flood.*

## II. *Admitting Ballistic Evidence and Refusing a Jury Visit to the Crime Scene*

Defendant claims that the trial court erred under state law by allowing the prosecution to introduce evidence regarding the gun's firing characteristics and the bullet's path, and by excluding his motion to have the jury view the crime scene. We disagree.

"On appeal, 'an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence . . . .' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007–1008 [81 Cal.Rptr.3d 299, 189 P.3d 300].) A trial court abuses its discretion when its ruling falls outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88 [24 Cal.Rptr.3d 507, 105 P.3d 1099].)

### A. *Test-firing the Bullet*

An investigator testified that he test-fired appellant's pistol six times and made a video recording of one of the experiments. On the ground of

irrelevance, defendant objected to the video's being considered at trial, but the trial court overruled his objection and the video was played in the courtroom and eventually admitted into evidence. After the verdicts came in, defendant filed a new trial motion in which he contended that it was error to admit the video into evidence. The court denied the motion.

The purpose of playing the video recording was to provide evidence that the pistol was operable, despite evidence favorable to defendant of the modification that reduced the force required to squeeze the trigger by two-thirds. The trial court did not abuse its discretion in allowing the video recording to be played and admitted into evidence. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 950 [44 Cal.Rptr.3d 237, 135 P.3d 649].) Defendant's claim is without merit.

### B. *Showing a Possible Bullet Path from Defendant's Vehicle*

Defendant also objected to the proposed admission of photographs showing his vehicle, the restaurant window, and orange tape leading from the former to the latter, thereby illustrating a possible path that the bullet could have taken. The trial court overruled his objection but told the jury: "[Y]ou do need to understand that this re-creation is merely a general re-creation. It is not the Court's impression that it is meant with any particular specificity, other than location of the vehicle and the general location according to testimony or statements previously made."

The trial court did not abuse its discretion in overruling defendant's objection. It was reasonable to permit the prosecution to introduce evidence that would help the jury understand the range of angles under which the bullet must have pierced the restaurant window. The defense was accident, and this evidence countered that defense by showing that the bullet went in a limited direction among all possible directions in which it could have gone if accidentally fired. The bullet did not go through the vehicle roof, into the ground, into a wall, or toward a remote location never to be found, but went through the window through which defendant could see Múñoz and Flores, broke the window, and was found inside the restaurant.

*People v. Gonzalez, supra,* 38 Cal.4th 932, addressed and rejected a similar claim. There, the defendant contended that "the court should have excluded [a] photograph as irrelevant and, if relevant, unduly prejudicial under Evidence Code section 352 because it was misleading in three respects: (1) the location of the photographer was unknown; (2) Detective Rodriguez was taller than the gunman; and (3) the photograph was taken with a flash so it did not show the actual lighting conditions." (*Id.* at p. 950.) *Gonzalez* explained that " '[t]he trial court has broad discretion both in determining the

relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value.' [Citation.] . . . As the trial court noted, the photograph was offered to show where the witnesses had said the gunman was standing. It was clearly probative on this point even if the exact position of the photographer was not known. It was not offered to show the height of the gunman or the lighting conditions. . . . Hence, the court acted within its discretion in admitting the photograph as illustrating where the witnesses placed the gunman." (*Ibid.*)

### C. *Denying Motion for Jury View*

Defendant filed a pretrial motion requesting a jury view of the shooting scene. Ultimately, near the end of trial and after discussing the motion with the parties, the trial court denied the motion, stating: "The Court has viewed all of the exhibits and the diagrams, the photographs, and everything that has been shown to the jury, at this time, to try to orient them and familiarize them with the area of McDonald's, the surrounding area and the interior of McDonald's, and the Court, at this time, does not feel that a site visit is warranted, based upon the nature and the number of photographs that the jurors have to use. Part of this decision is based upon the fact that that window—the window, in question, is no longer there, obviously."

In the new trial motion mentioned above, defendant reargued the issue, but as noted, the trial court denied that motion.

Section 1119 provides in pertinent part: "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred . . . it may order the jury to be conducted . . . to the place . . . ."

"Whether to permit the jury to view the scene of a crime falls within the court's discretion, reviewable for abuse." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

No abuse of discretion occurred. The jury heard extensive testimony about the crime scene. It saw pictures showing the spatial relationship between defendant's vehicle and the restaurant window. The trial court noted this in support of its ruling, and given the accuracy of its statement, it cannot be said that its decision fell outside the bounds of reason. (*People v. Benavides, supra,* 35 Cal.4th at p. 88.)

III. *Sufficiency of the Evidence for Gang Benefit Allegations and Conviction*

Defendant claims that the evidence was insufficient for the jury to find true the gang benefit allegation and to convict him of street terrorism. We disagree.

A. *Gang Benefit Allegations*

As noted, the jury returned true findings on allegations that defendant committed all of the offenses, except the gang-related street terrorism crime, for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).)

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 [119 Cal.Rptr.3d 415, 244 P.3d 1062].)

The pertinent part of subdivision (b)(1) of section 186.22 penalizes "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."

There was ample evidence of defendant's Norteño connections and of the value to the gang of his shooting at a member of the rival Sureños. Defendant picks at aspects of the testimony of the prosecution's gang expert, identifying some of them as irrelevant, distracting, or otherwise substantially more prejudicial than probative (Evid. Code, § 352), and essentially calling the testimony conjectural and without evidentiary support. (See *People v. Moore* (2011) 51 Cal.4th 386, 405–406 [121 Cal.Rptr.3d 280, 247 P.3d 515].) But considering the testimony as a whole, which we must do for purposes of sufficiency-of-the-evidence analysis, even if defendant is correct about some aspects of the expert's testimony, other aspects were valuable. The gravamen of the expert's testimony was an explanation of the Norteños' honor-based

culture, their rivalry with the Sureños, and the motifs that active Norteño members use to identify themselves. This provided valuable background for other witnesses' testimony about defendant's possession of a wide variety of Norteño paraphernalia and his admission to the sheriff's detective that he was a Norteño. In addition, as we have noted, defendant knew Múñoz to be a Sureño, Múñoz was dressed in the blue Sureño color when defendant shot at him, and there was no obvious reason for one person to shoot at someone he barely knew on the basis defendant gave for committing this crime, i.e., that Múñoz's neighbor, who was a friend of defendant, and Múñoz did not like each other.

## B. *Criminal Street Gang Terrorism Conviction*

As noted, defendant was convicted in count eight of criminal street gang terrorism in violation of subdivision (a) of section 186.22. In pertinent part, this provision punishes "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang . . . ." "As the statutory text indicates, the gang crime has three elements: (1) '[a]ctive participation in a criminal street gang, in the sense of participation that is more than nominal or passive,' (2) ' "knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity," ' and (3) 'the person "willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." [Citation.]' [Citation.]" (*People v. Mesa* (2012) 54 Cal.4th 191, 197 [142 Cal.Rptr.3d 2, 277 P.3d 743].)

"In reviewing a criminal conviction challenged as lacking evidentiary support, ' "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' " (*People v. Streeter* (2012) 54 Cal.4th 205, 241 [142 Cal.Rptr.3d 481, 278 P.3d 754].)

There was sufficient evidence of the elements of the crime. We have described the ample evidence that defendant was active in the Norteños. Regarding the second element of the crime, defendant insists that his Norteño-related activities were not those of a full-fledged member and that there was no evidence he knew what the Norteños were about. The evidence that defendant knew about the nature of the Norteño organization, however, comes from the array of gang paraphernalia he possessed, his prior probation condition to avoid gangs, and, most stark of all, his willingness to shoot at a

Sureño[6] for no good reason. Regarding the third element, the gang expert's testimony sufficed to establish that defendant shot in the direction of Múñoz and Flores to promote the Norteños' interests.

### IV. *Cumulative Error*

Finally, defendant claims that his due process right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution was violated because of the cumulative effect of the trial court's errors and the prosecutor's misconduct during closing argument.

A claim of cumulative error is in essence a due process claim and is often presented as such (see, e.g., *People v. Rogers* (2006) 39 Cal.4th 826, 911 [48 Cal.Rptr.3d 1, 141 P.3d 135]). "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 [118 Cal.Rptr.2d 668].)

■ Taking all of defendant's claims into account, we are satisfied that he received a fair trial, although we agree that the prosecutor should not have invoked the authority of the California Supreme Court and the California Court of Appeal during closing argument and misstated the evidence at one point by arguing that defendant never told the police the shooting was accidental. " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' [Citation.] The few errors that occurred during defendant's trial were harmless, whether considered individually or collectively. Defendant was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009 [108 Cal.Rptr.2d 291, 25 P.3d 519].) We deny this final claim.

## DISPOSITION

The judgment is affirmed.

Elia, Acting P. J., concurred.

**MIHARA, J.,** Concurring.—I agree with my colleagues that the prosecutor's comments regarding the California Supreme Court and the California Court of Appeal were inappropriate and amounted to prosecutorial misconduct but did not prejudice defendant.

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to

---

[6] As described, in his testimony defendant implied that he believed the victim was a Sureño.

persuade either the trial court or the jury, and when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Rundle* (2008) 43 Cal.4th 76, 157 [74 Cal.Rptr.3d 454, 180 P.3d 224] (*Rundle*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

It is only where the trial was fundamentally unfair that we evaluate any error under the federal standard; otherwise, we apply the state law harmless error standard of review. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514–515 [69 Cal.Rptr.3d 25].) Under the state law standard, reversal is required "only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred ([*People v. Watson*] [(1956)] 46 Cal.2d 818, 836 [299 P.2d 243])." (*People v. Breverman* (1998) 19 Cal.4th 142, 178 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Defendant takes issue with three comments by the prosecutor referring to the California Supreme Court and the California Court of Appeal. The first comment was the prosecutor's statement that the California Supreme Court had decided that an inference of intent to kill arises from the act of firing a gun at another from close range. His second comment was that the California Supreme Court had decided that the intent to kill two different victims "can be inferred" from evidence that the defendant fired a single shot at two visible victims. The third comment was that the California Court of Appeal had decided that a defendant's act of firing a "rifle" toward a victim from 20 yards away in a manner that could have inflicted a mortal wound if the bullet had reached its target "was sufficient to support an inference of intent to kill."

The legal substance of the prosecutor's comments was not inaccurate. (*People v. Perez* (2010) 50 Cal.4th 222, 230, 233 [112 Cal.Rptr.3d 310, 234 P.3d 557]; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 [60 Cal.Rptr.2d 761].) The prosecutor was entitled to argue to the jury that the evidence was sufficient to support an inference of intent to kill. However, the prosecutor's attempt to characterize his arguments as holdings by the California Supreme Court and the California Court of Appeal was completely improper and had the potential to create a misimpression that these courts had signaled their agreement with the prosecutor's arguments about the facts of this case.

Although the prosecutor's comments in this regard were improper, they did not amount to federal constitutional error because they did not so infect the entire trial with unfairness that due process was violated. (*Rundle, supra*, 43 Cal.4th at p. 157.) The improper references were brief and were not inflammatory. Because they occurred during argument, and the jury was instructed that argument was not evidence, the improper comments had little potential to compromise the fairness of the trial as a whole.

Still, the prosecutor's comments were deceptive, and they therefore constituted state law error, which would merit reversal if it were reasonably probable that defendant would have fared better in their absence. Here, reversal is not merited. These brief, noninflammatory comments were unlikely to deceive a jury that was given copious instructions on the burden and standard of proof and on its responsibility to determine whether defendant harbored the required intent to kill. Notably, the jury acquitted defendant of the second attempted murder count even though the prosecutor argued that the California Supreme Court had ruled that an intent to kill two victims could be inferred from evidence that a single shot was filed at two visible victims, as occurred here. Under these circumstances, and in light of the very strong evidence that defendant in fact harbored the requisite intent to kill, it is not reasonably probable that the prosecutor's comments influenced the result. For these reasons, I agree with my colleagues that these comments do not merit reversal.

Appellant's petition for review by the Supreme Court was denied March 20, 2013, S208107.