Filed 2/4/14  P. v. Smith CA2/2
Opinion following order vacating prior opinion

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B243212 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA120307) |
| v. | |
| QUANALE SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Patrick Connolly, Judge.  Affirmed.

Landra E. Rosenthal, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Quanale Smith (defendant) challenges the sufficiency of the evidence to support his conviction of murder, as well as the evidence to support a finding that the crime was committed for the benefit of a gang. We conclude that substantial evidence supports both defendant's conviction and the gang enhancement and affirm the judgment.

## BACKGROUND

**Procedural history**

Defendant was charged in count 1 with the murder of Arthur Johnson (Arthur),[1] in violation of Penal Code section 187, subdivision (a),[2] and in count 2 with the willful, deliberate, and premeditated attempted murder of Delwan Chiles (Chiles), in violation of sections 664 and 187, subdivision (a). The information alleged as to both counts that defendant personally used and discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (d), and that the crime was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). A jury found defendant guilty of second degree murder (count 1), and not guilty of attempted murder (count 2). The jury found true the gang allegation and the firearm enhancements alleged under section 12022.53, subdivisions (b) and (c), but found the firearm enhancement alleged under section 12022.53, subdivision (d), not true.

On August 8, 2012, the trial court sentenced defendant to 15 years to life in prison as to count 1, enhanced by a consecutive term of 20 years to life under section 12022.53, subdivision (c). The trial court awarded custody credit of 399 actual days, and ordered defendant to pay $5,000 plus interest to the Victim's Compensation Board. Defendant filed a timely notice of appeal.

---

[1] We refer to Arthur Johnson and his brother Aaron Johnson by their first names to avoid confusion.

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

**Prosecution evidence**

Sometime after 5:00 p.m. on Saturday afternoon, June 11, 2011, gunfire erupted as a group of neighbors was putting together a makeshift basketball court near Grape Avenue and Nord Street in Compton. Several gangs operated in that area, and the group setting up the basketball court included members of the Anzac Grape Street Crip gang (Anzac), a primarily African-American gang which claimed the neighborhood around the intersection of Nord Street and Grape Avenue as its territory. Anzac had an ongoing rivalry with another African-American gang, the Original Front Hood Crip gang (Front Hood), which operated in a nearby neighborhood.

Nord Street resident Rose Mary Fuller Laster (Laster), testified she heard 10 to 12 gunshots, ran to close her front door and saw a medium-sized black car with a Saturn symbol in the intersection. An African-American man got out from the passenger side, reached over the roof of the car and fired a gun five to seven times. He reentered the car and as it moved slowly past her door Laster was able to see the driver, an African-American man who was wearing a blue baseball cap with a red "A."

Another neighbor, Ohmesha Hester, testified she and her boyfriend Kenneth Mitchell (Mitchell) had been among the group of approximately 15 men, women and children who were setting up the basketball court. Hester had lived in the neighborhood, knew it to be claimed by Anzac and that Mitchell had been a member of that gang. Hester was across the street when she saw people suddenly run away from the area of the basketball court. She looked in the opposite direction, saw two African-American men coming toward her pointing guns with their arms extended, and heard gunfire coming from their direction. Hester yelled at one of them to stop, and when he did, she immediately got into a car and drove away with her mother. On their way out of the neighborhood they passed a person standing on top of a car shooting first toward a nearby gate and then toward the ground.

Another neighbor, Petra Guzman (Guzman), testified she was at home with her fiancé, Juan Ochoa (Ochoa), when she heard several gunshots, looked out the window

3

and saw people running. She saw her neighbor Aaron Johnson (Aaron)[3] behind a gray van parked in a driveway, firing a gun toward the intersection of Grape Avenue and Nord Street. She then saw a second person behind a black car next to the van firing a gun in the same direction as Aaron. Guzman saw either the second shooter or another man jump on top of the black car and fire his gun twice. Guzman and Ochoa then both threw themselves on the floor. Later when she looked outside, she saw that Aaron's brother, Arthur, had been shot and two men were pulling his body from under the van. Although Guzman was unable to identify a photograph of the second shooter, she testified though not certain, she thought she saw him back in the neighborhood the next day wearing a bandage on his head. That man and others put up candles and pictures in the area of the shooting and held a memorial.

Chiles testified he was among the people setting up the basketball court along with his cousins Arthur and Aaron. When he heard the gunshots Chiles and Arthur took cover under a van where he cut his head. From under the van he could see a person advancing toward him firing a gun multiple times. Chiles was a reluctant witness and answered questions with denials or a lack of recollection. Los Angeles County Deputy Sheriff Isidro Martinez testified he spoke to Chiles in the hospital the day of the shooting while Chiles was being treated for the laceration on his head. Chiles said that while he was helping assemble a basketball court one of his friends, "Tre," yelled, "Oh, shit," and then ran westbound on Nord Street. Chiles followed and then hid behind a black Honda and a GMC van, where when he looked east on Nord Street he saw an African-American man, between 18 and 21 years old wearing a white T-shirt and black shorts, firing a black handgun. When Chiles hid under the van the man approached and continued to shoot at him about 10 to 15 times.

Deputy Brian Richards and his partner arrived on the scene shortly after the shooting. In addition to other deputies and a chaotic group of screaming people, he saw Arthur lying on the ground in the driveway of 2011 North Grape Avenue with a gunshot

---

**3**      See footnote 1, *ante*.

wound to the chest and Chiles, bleeding and only somewhat conscious, and uncooperative. Deputy Richards observed shell casings in the middle of the intersection of Grape Avenue and Nord Street, and throughout the yard of 2011 North Grape Avenue.

Guzman's son Daniel Moreno (Moreno) testified he arrived home just after the shooting, saw a group of obviously upset people across the street, including Aaron, surrounding the body of his neighbor Arthur, where he lay on the ground under a van. Before the police arrived Moreno saw a tall African-American man walk quickly into a nearby backyard carrying a little white cloth bag that appeared to contain something heavy and consistent with the size and shape of a gun. Moreno then saw the man come out of the backyard a few minutes later without the cloth bag and join the crowd surrounding Arthur. The man wore his hair shaved or very short, had a medium to dark complexion, wore a white shirt, and did not walk with a limp. Moreno had seen the man before but did not know his name.

The next day, at the neighborhood memorial for Arthur, Moreno again saw the same man, this time wearing glasses and a bandage on his head. Moreno saw the man reenact the shooting of the day before by simulating a gun and pretending to fire it. A couple of hours later, as a police helicopter circled the neighborhood, Moreno saw a different man go into the same yard where the white cloth bag had been taken, and come out with a weapon which he fired into the air.

Defendant's uncle, Tony Curtis Smith (Smith), testified that on the day of the shooting he and defendant lived in the same house on West 133rd Street in Compton, in an area claimed by Front Hood. Smith denied that defendant was a member of the gang. Sometime during the afternoon of the shooting, defendant had called Smith and said he had been shot. Defendant asked Smith to come and get him on Grape Avenue, a few houses south of Nord Street. When he arrived Smith saw a group of people near the intersection and found defendant in a nearby driveway, blood dripping down his shirt from an apparent gunshot wound to his chest and stomach. As defendant entered the car Smith saw he had also been shot in the leg and could barely walk.

5

Smith drove quickly toward Martin Luther King Hospital (MLK), forgetting that it no longer had a trauma center. Smith ran out of gas on the way and was able to convince two women in the car ahead of him to take defendant to the hospital. One of the women, Gabriela Martinez (Martinez), testified that a man opened her car door as she was stopped at a traffic light and asked her to take his friend or cousin to the hospital because he had been shot. The man opened the back door, placed the injured man into her car and explained that he had run out of gas. Martinez drove two blocks to MLK, where she waved down a police officer. Martinez later identified the injured man as defendant.

Defendant was taken to another hospital where Deputy Scott Giles was assigned to provide security for him. Though defendant was in bed wearing a hospital gown, Deputy Giles was able to observe a gunshot wound to defendant's left knee and another one to his upper right pectoral. Deputy Giles and another deputy discussed gunshot residue (GSR) within defendant's hearing, prompting defendant to ask what GSR was. Receiving no reply, defendant said he was not stupid; he knew it was gunshot residue because he watched "First 48." Defendant then put his hands under the blanket and appeared to urinate on them. The blanket became wet, and when defendant brought his hands back out they were also wet. As defendant wiped his hands with the blanket, he said he had gunshot residue on his hands because he had gone to a shooting range. Deputy Giles attempted to retrieve defendant's clothing later, but he was unsuccessful.

Another deputy conducted a GSR test on defendant later that evening. Senior Criminalist Kristina Fritz testified that urinating on one's hand and rubbing them could cause GSR particles to disperse, nevertheless when she analyzed the samples taken from defendant's hands she detected two groups of particles consistent with GSR: one group with one particle and one group with four particles. The criminalist concluded that the GSR result was positive, meaning that the result was consistent with a finding that the test subject either handled or discharged a firearm, or was in close proximity to a discharging firearm.

On the afternoon following the shooting, while in the hospital, defendant learned he was scheduled to have surgery. Nurse Shamima Ferdous testified that when informed,

6

defendant became upset and demanded she call the doctor.  After 40 minutes and two unanswered pages, defendant insisted Nurse Ferdous change his dressing and remove the intravenous drip needle so he could leave immediately.  Nurse Ferdous complied and asked defendant to sign the form explaining the risks of leaving the hospital against medical advice.  Since defendant refused to sign and to wait for a wheelchair, his girlfriend signed the form and helped him out.

Deputy Medical Examiner David Whiteman determined that Arthur died from a gunshot wound to the torso.  Dr. Whiteman testified the chest wound could have been inflicted by someone firing downward from above while the victim was lying face down or on his side on the ground.

The day after the shooting Aaron was a passenger in a car that was pursued by deputies.  During the pursuit the car stopped abruptly and Aaron and the driver fled on foot dropping a .40-caliber H and K handgun and a .357 magnum revolver.  Deputies recovered both weapons and arrested Aaron.

Senior Criminalist Marco Iezza (Iezza), who assisted in examining the crime scene and who analyzed the firearms-related evidence, testified that a Springfield Armory 1911 pistol, loaded with .45-caliber rounds, and an empty .45-caliber magazine were found in the backyard of 2011 North Grape Avenue.  In another part of the backyard, Iezza found a sock containing three H and K brand ammunition magazines, two of which were loaded with .40-caliber cartridges, and a third magazine, which was empty.  Iezza determined that three guns were fired during the incident:  the Springfield Armory 1911 pistol and two .40-caliber handguns.  One of the .40-caliber handguns was recovered but the other was not.

Of the 22 spent shell casings recovered from the area of the shooting, eight were from a .45-caliber weapon and 14 were from .40-caliber weapons.  Many of the .40-caliber casings were found in the intersection of Grape Avenue and Nord Street and near the front yard of 2011 North Grape Avenue.  Most of the .45-caliber casings were found in the driveway of the house, between the GMC van and the black Honda.  Iezza determined that a bullet recovered from a door of the van had been fired by the

7

Springfield Armory 1911 pistol and that all the .45-calibur casings recovered from the driveway had been ejected from the same pistol.

A substance appearing to be blood was found on the Springfield Armory 1911 pistol and .45-caliber magazine. An analysis revealed the DNA of two individuals on the pistol, including that of defendant. Arthur and Aaron were each excluded as the second contributor of DNA on the pistol. The identity of that person remained unknown. Only defendant's DNA was found on the magazine.

Investigating officer, Detective John Duncan, was present in the courtroom throughout the trial. He testified that on the preceding day, a few minutes after court had recessed for the day, defendant turned, looked at Detective Duncan and said, "On Front Hood." Detective Duncan had previously been a gang detective and understood defendant's statement as an expression of pride in being a Front Hood gang member.

**Gang expert**

Sergeant Brian Richardson, formerly assigned to a Sheriff's Department anti-gang unit, testified as the prosecution's gang expert. He explained gang culture in general and several terms commonly used in gang jargon.

Sergeant Richardson testified that in gang culture, "respect" was a very important concept. He explained that gang members felt a sense of ownership in their territory and if a gang member crossed into the territory of another gang it would be a sign of disrespect. Respect was created by building a strong reputation for violence, which in turn, spread fear and intimidation in the neighborhood and among rival gang members. Such respect protected the gang's borders and the gang and its members from criminal prosecution by discouraging witnesses from giving information to law enforcement. A person providing information to law enforcement about criminal activity would be labeled a "snitch" and could expect to be assaulted or even murdered by gang members. Individual gang members earned respect for their gang and within the gang by "putting in work" in the form of committing crimes. Gangs required their members to put in work and younger gang members were expected to commit the more violent crimes.

Sergeant Richardson was familiar with Front Hood and had investigated the gang and its members. Front Hood was one of the most violent criminal street gangs in Compton in June 2011, and its primary activities included murder, attempted murder, illegal possession of firearms, assaults, and drive-by shootings. The gang had 228 documented members and used common signs and symbols. The conviction records of two Front Hood members, Jacori Arman Williams for a 2010 attempted murder and Maurice Leon Venable for a 2009 murder, were admitted into evidence.

Sergeant Richardson was also knowledgeable about Anzac, one of Front Hood's several rivals. At the time of the shooting a "major gang war" was going on between Front Hood and Anzac. Anzac members often congregated at 2011 North Grape Avenue, which was commonly known as Anzac's "headquarters." Sergeant Richardson was acquainted with Arthur and Aaron and knew both of them to be members of Anzac. He once investigated a case in which Arthur had been assaulted with a shotgun by a suspected Front Hood gang member. Sergeant Richardson was also acquainted with Mitchell (Hester's boyfriend), who Sergeant Richardson opined was a member of Anzac.

Based on photographs of defendant's gang tattoos and numerous prior contacts with defendant, it was Sergeant Richardson's opinion that defendant was a member of Front Hood with a gang moniker of "Lil Ice." Defendant's admission of gang membership to Sergeant Richardson during a field interview in May 2011 was documented on a field interview card along with defendant's height, weight, and birth date. Sergeant Richardson described defendant's tattoos, which included: a money sign and a Monopoly game character holding a sawed-off shotgun, representing the importance of money to the gang; the number 13, representing the block in gang territory on which he grew up; "OFH" for Original Front Hood; "Crippin"; "Compton," a tattoo commonly used by gang members to intimidate and frighten people; "7/11/85" next to "F-I-P" over "O-Dog," who was the brother of a gang member; and another F-I-P next to "Spoon." Sergeant Richardson explained that F-I-P stood for Front in Peace, a variation of rest in peace, referring to persons who had died.

9

Given a hypothetical question mirroring the facts of this case, Sergeant Richardson opined that the crimes were committed for the benefit and at the direction of a criminal street gang by creating fear of the gang within the community in order to enhance its reputation and respect; and that the shooter was on a mission to put in work for his gang in order to build his own reputation within the gang. Sergeant Richardson based his opinion on the ongoing violent war between Front Hood and Anzac, and Front Hood's need to cause fear and intimidation in order to enhance its reputation.

The prosecutor elicited Sergeant Richardson's opinion regarding the significance of the statement, "On Front Hood," as made by a known, documented member of the gang. Sergeant Richardson said it would be an expression of pride in the speaker's membership in Front Hood, as well as a statement that he was representing the gang.

**Defense evidence**

Josue A. testified he was outside on June 11, 2011, and after hearing four or five gunshots, ran home, looked out the window, and saw a man, without any limp, quickly sprint toward Wilmington Avenue. Josue A. called 911 and described the man though he could not later identify the man in photographs or in court.

Forensic scientist Marc Scott Taylor (Taylor) testified he tested the .45-caliber handgun and magazines collected from the shooting scene. He agreed that the DNA recovered from the barrel of the gun and the magazine was consistent with defendant's DNA profile, but there was insufficient identifiable DNA on the grip, trigger, interior of the trigger guard, the frame of the gun, or any other item in evidence to make a match. It was his opinion it could not be determined how the DNA was deposited or who held or fired the gun.

Taylor explained GSR and that one gunshot would expel more or less 20,000 GSR particles depending on the type of ammunition. Taylor agreed with the Sheriff's Department conclusion that the presence of GSR particles found on defendant was consistent with handling or discharging a firearm, being in close proximity to a discharging firearm, or otherwise being in contact with an environment of gunshot primer residue. In an environment in which approximately 30 bullets were fired, a person could

10

have GSR deposited on him from 10 to 20 feet away from the guns being fired. Simply handling a gun that had been fired previously could also transfer GSR particles.

Ochoa (Guzman's fiancé) testified he lived with Guzman and was home watching television on June 11, 2011, when he heard gunshots. As he looked out of his living room window he saw a young man get out of the passenger side of a black car and fire a gun from behind the car. Ochoa said the shooter was Latino and was not defendant.

The defense gang expert, Greg Estevane, gave a short history of Blood and Crip gangs in Los Angeles and explained why young people joined gangs. He testified regarding ongoing hostility between African-American gangs and Latino gangs, such as Front Hood's rivalry with the Tortilla Flats gang, although he agreed that African-American gang members also commit crimes against other African-American gang members. Estevane also agreed that loyalty to a member's gang sometimes took precedence over loyalty to relatives with different gang affiliations.

Defendant testified he was 23 years old and had always lived in same house on West 133rd Street, which was essentially the same street as Nord Street divided by Wilmington Avenue. Defendant denied he was an active gang member, but admitted his affiliation with Front Hood since childhood. He also admitted a prior conviction for auto theft and that he was in prison continuously from 2008 to mid-2010. Defendant denied any rivalry between Front Hood and Anzac, and claimed they played on the same teams, went to the same church, park, and schools without any problems with each other. He claimed he was acquainted with most of the 35 members of Anzac, had never had a conflict with any of them, and that he visited friends and relatives in the Anzac neighborhood once or twice a week.

Defendant denied that he fired any shots on June 11, 2011, and claimed he was in the front yard of his home picking up trash for his aged grandmother when a black car pulled up and two Mexicans got out holding guns. Not wanting to put his grandmother in jeopardy, defendant ran toward Wilmington Avenue. He heard four or five gunshots as he ran into someone's yard where he hid for 20 or 30 minutes. Defendant then headed toward a market on Wilmington Avenue, but saw the car again so ran across Wilmington

11

Avenue to Nord Street where he again saw the black car and heard more shooting. Defendant said when he reached Nord Street between Grape Avenue and Anzac Avenue, he was shot and took cover between a van and a black car in a driveway. When someone ran by his hiding place and dropped a gun defendant picked it up with his bloody hands intending to use it for protection. The gun appeared to be jammed, so defendant took out the magazine clip in an attempt to fix it, saw it was empty, put the gun down and ran east on Nord Street, then south on Grape Avenue. As he passed a house on Grape Avenue, defendant was shot again. Defendant claimed the shooter, who he recognized as "D.J.," a former teammate, came out of the house, stood over defendant as though he intended to shoot defendant again, but then ran away.

Defendant had two cell phones with him but he did not call for an ambulance because he was afraid the shooters would come back, and since he was on parole. Defendant did not call the police because that would endanger his family, so instead he called his uncle, Smith. At the hospital defendant was handcuffed to the bed and not allowed to use the restroom, despite his urgent need to urinate. The nurse brought a plastic container which he used while still in bed. Defendant claimed he left the hospital when he learned of the planned surgery to remove bullet fragments because he was told the surgery was optional and could result in nerve damage. He also knew his girlfriend, a nurse, would take care of him. In addition, defendant did not want to speak to the police and become known in the neighborhood as a snitch, as that would endanger his grandmother.

Defendant admitted he never told anyone before his testimony at trial that he was shot while on Nord Street between Anzac Avenue and Grape Avenue. He also admitted he lied to detectives Valento and Duncan when he told them he was shot twice while standing in front of his West 133rd Street home. Defendant denied saying "On Front Hood" to Detective Duncan in court, and claimed Detective Duncan made it up. Defendant also said Detective Duncan had been harassing him since he left prison as well as bothering both his uncle and his father. Defendant denied having committed a crime

12

and added, "All the witnesses said I didn't do anything. I'm a victim of the crime, but I'm being tried for the actual crime, when I'm a victim myself."

Defendant's family friend Dion Dorell Hodges (Hodges) testified that he was 43 years old and was like an uncle to defendant, who he had known since defendant's birth. Hodges lived close to Anzac territory but was unaware of a gang war. He was released from prison in spring 2011 after being there for 25 months. Hodges had no contact with defendant in his neighborhood since his release from prison, but prior to his incarceration defendant would visit there three or four times per month. Hodges testified that both he and defendant were members of Front Hood, and that he had been a member since 1979, although inactive since the 1980's. While active, Hodges had no problems with Anzac gang members and was unaware of any rivalry between Anzac and Front Hood. Hodges testified that active or inactive, he and defendant were still members of the same gang and thus "ha[d] each other's back."

## DISCUSSION

### I. Substantial evidence of defendant's guilt

Defendant contends that his murder conviction was not supported by substantial evidence. When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*Ibid.*) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient

13

substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Contrary to the principles we have just summarized, defendant suggests that we should determine reasonable doubt and disregard the evidence against him in favor of his own explanations and inferences. For example, he suggests that the inference that he used the .45-caliber pistol should be rejected in favor of his explanation that when he picked up the gun someone had fortuitously dropped, GSR got on his hands and his blood was deposited on the gun. Defendant also suggests that we should reject the prosecutor's argument that he fled the scene, in favor of his explanation that he left the scene not because he was guilty but because he was afraid and needed to get to a hospital. Finally, defendant argues that he could not be convicted as an aider and abettor because the second shooter was not identified and it was not shown which caliber bullet killed Arthur.

We reject defendant's suggestions. The reviewing court does not determine whether the evidence was sufficient to prove defendant guilty beyond a reasonable doubt; we determine whether there was substantial evidence that would permit a rational jury to find him guilty beyond a reasonable doubt. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) Further, the jury was not required to believe defendant's testimony. (See *People v. Burney* (2009) 47 Cal.4th 203, 254.) We must accept the jury's resolution of credibility issues and evidentiary conflicts, as well as the logical inferences the jury apparently drew from the circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396, 403.) Finally, there is no requirement that the co-perpetrator must be identified for aider and abettor liability to attach. (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 72.)

Substantial evidence supports defendant's conviction. At least two shooters entered the Anzac gang neighborhood and fired in the direction of Aaron and Arthur, both members of Anzac. One of the shooters stood on top of a car next to the van under which Arthur had taken cover and fired in a downward direction. Arthur's wounds were consistent with such a downward trajectory. Forty-five-caliber bullet casings were found in that area and a .45-caliber bullet was found in the van. Defendant's DNA was found

14

on both the .45-caliber weapon that fired the bullet and expended the casings and the magazine of .45-caliber ammunition found with the weapon; GSR particles were recovered from defendant's hands; defendant was a member of Anzac's rival, Front Hood; and defendant admitted being near Grape Avenue and Nord Street at the time of the shooting. Aaron and another person fired back at the shooters and defendant suffered two bullet wounds. Defendant then fled twice, once from the area of the crime scene and again from the hospital upon learning that bullet fragments would be removed from his body. Defendant also attempted to destroy evidence by urinating on his hands and rubbing them once he heard that a GSR test might be administered.

From such evidence the jury could reasonably infer that defendant was one of the shooters who entered the neighborhood and fired weapons at Anzac gang members, and further that defendant was the shooter who fired the .45-caliber weapon toward Arthur, Aaron and Chiles as they took cover behind and under the van. We conclude substantial evidence supported the murder verdict.

## II. Substantial gang evidence

Defendant contends that the gang enhancement was not supported by substantial evidence. A finding under section 186.22, subdivision (b)(1), has two elements: (1) the crime was committed for the benefit of, at the direction of, or in association with any criminal street gang; and (2) the crime was committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. (*People v. Albillar* (2010) 51 Cal.4th 47, 64-65, 67-68.) Defendant challenges the evidence supporting the first element: he contends the evidence was insufficient to show the crime was committed for the benefit of a gang.

To support his argument, defendant summarizes selected parts of the evidence in the light most favorable to his position; he also points to conflicting evidence and draws inferences that would defeat the judgment. Defendant suggests that evidence of the gang affiliation of Arthur and Aaron was conflicting because Chiles denied that he and Arthur were gang members. Defendant minimizes the Anzac/Front Hood rivalry by pointing to Sergeant Richardson's testimony that the rivalry between the two gangs had not been

15

violent prior to 2009.  Defendant also relies on his own testimony in which he denied being an active member of his gang; and the absence of an express admission that he was acting at the direction of or with the consent of the gang; and there was no evidence of "throwing" gang signs, graffiti, or anything to suggest that he or Front Hood took credit for the shooting.

Defendant's view of the evidence is not helpful, as a jury's true finding of the gang enhancement allegation is reviewed under the same substantial evidence standard as any other conviction.  (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.)  Thus, we review the entire record in the light most favorable to the judgment and we draw all inferences the jury could reasonably have drawn.  (*Albillar*, *supra*, 51 Cal.4th at pp. 59-60.)  "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'  [Citation.]"  (*Ibid*.)  Nor do we resolve conflicts in the evidence.  (*People v. Young, supra*, 34 Cal.4th at p. 1181.)

A gang finding may be based upon circumstantial evidence, and "[i]t is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation. [Citation.]"  (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.)  In addition, the jury may consider an expert's opinion that an offense is gang-related so long as the opinion is given in response to a hypothetical question "rooted in the facts shown by the evidence . . . . [Citations.]"  (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.)  "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1). [Citations.]"  (*People v. Albillar, supra*, 51 Cal.4th at p. 63.)  Such expert testimony is particularly significant when the evidence shows that the defendant was a gang member when he shot at rival gang members for no other apparent reason.  (*People v. Jasso* (2012) 211 Cal.App.4th 1354, 1377-1378.)

16

Here, viewing the evidence in the light most favorable to the judgment and drawing reasonable inferences in support of the judgment, we find substantial evidence supports the jury's finding that the shooting was committed for the benefit of Front Hood. Such evidence is found in the circumstances surrounding the shooting and its aftermath, along with Sergeant Richardson's testimony regarding the culture and habits of Anzac and Front Hood, defendant's status as a member of Front Hood, that he targeted rival gang members in their claimed territory, and Sergeant Richardson's opinion that the crimes were committed for the benefit of the gang.

Defendant was a self-confessed member of Front Hood and was 22 years old at the time of the shooting. As a younger member of the gang he was expected to commit violent crimes that would benefit the gang by spreading fear and intimidation in the community. Defendant entered rival Anzac territory at the time that Front Hood was at "war" with Anzac, accompanied by one or more accomplices, and fired at Anzac members as they took cover in the driveway of Anzac's headquarters. Contrary to defendant's claim that there was no evidence that he or Front Hood took credit for the shooting, defendant turned to one of the investigating detectives midtrial and said, "On Front Hood," expressing pride in his gang and communicating that he was then representing the gang.

We conclude that substantial evidence also supported the benefit element and we are not persuaded otherwise by the line of cases upon which defendant relies to argue that a gang expert's opinion must be supported by additional evidence demonstrating that the crime was committed to benefit a gang. (See *People v. Ochoa, supra*, 179 Cal.App.4th at p. 657 ["gang expert's testimony alone is insufficient to find an offense gang related"]; *People v. Ramon* (2009) 175 Cal.App.4th 843, 851 [the gang "expert simply informed the jury of how he felt the case should be resolved"]; *People v. Albarran* (2007) 149 Cal.App.4th 214; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199 ["expert simply informed the judge of her belief of the minor's intent"]; *People v. Killebrew* (2002) 103 Cal.App.4th 644, 647 [handgun possession improperly based on expert's opinion that gang members possessed guns in common], disapproved in part in *People v. Vang* (2011)

17

52 Cal.4th 1038, 1047 & fn. 3, 1048.) The continuing vitality of the view represented by these cases is in question as the California Supreme Court has more recently held: "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang, supra*, at p. 1048; see also *Albillar, supra*, 51 Cal.4th at p. 63.)[4]

Defendant also relies on federal cases that have no application to the issue of whether substantial evidence supports a finding that the crimes were committed for the benefit of a gang. (See *Garcia v. Carey* (9th Cir. 2005) 395 F.3d 1099, 1103 [no evidence of "specific intent to facilitate other criminal conduct" by defendant's gang];[5] *United States v. Garcia* (9th Cir. 1998) 151 F.3d 1243, 1246 [gang membership alone is insufficient proof of aiding and abetting]; *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, 1342 [same].)

In any event, comparisons with cases in which the evidence was insufficient is rarely helpful in a substantial evidence review, as every case necessarily depends on its own facts. (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) The facts in this case clearly support a finding that Arthur's murder was committed for the benefit of defendant's gang.

---

[4]     Defendant also relies on *People v. Albarran, supra*, 149 Cal.App.4th 214, which involved neither the sufficiency of the expert's opinion nor a substantial evidence issue. There the appellate court held the gang evidence was irrelevant to the underlying charges and extraordinarily prejudicial. (*Id.* at p. 228.)

[5]     The holding in *Garcia v. Carey, supra*, 395 F.3d 1099, was rejected by the California Supreme Court in *Albillar, supra*, 51 Cal.4th at pages 64-67, as it was premised on a faulty interpretation of section 186.22, subdivision (b)(1).

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
FERNS

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.