Filed 11/3/15  P. v. Shields CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE, | C070420 |
| Plaintiff and Respondent, | (Super. Ct. No. MCYKCRBF092304) |
| v. | |
| PAMELA JEAN SHIELDS, | |
| Defendant and Appellant. | |

Defendant Pamela Jean Shields appeals following her conviction for possession of methamphetamine for sale (Health & Saf. Code, § 11378), while armed with a firearm (Pen. Code, § 12022, subd. (c)), and possessing for sale 57 grams or more of a substance containing methamphetamine (Pen. Code, § 1203.073, subd. (b)(2)).  The trial court imposed a six-year state prison sentence, but suspended execution of the sentence and placed defendant on three years' probation.  Defendant contends:  (1) the trial court erred in allowing the prosecution to impeach the defense drug expert with the expert's 20-year-old arrest for cocaine possession during a court recess in a criminal case in which he was testifying as an expert; (2) defense counsel provided constitutionally ineffective assistance of counsel when he failed to object to prosecutorial misconduct related to the

1

prosecutor's cross-examination of defendant in which the prosecutor purportedly asked whether a law enforcement agent had lied during his testimony and later failed to object to the prosecutor's closing arguments about defendant's testimony in response to that line of cross-examination; and (3) the trial court made a prejudicial comment to the jurors about " 'wrongdoers.' "

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

An information charged defendant with possession of methamphetamine for sale (Health & Saf. Code, § 11378), while armed with a firearm (Pen. Code, § 12022, subd. (c)), and possessed for sale a substance containing 28.5 grams or more of methamphetamine or 57 grams or more of a substance containing methamphetamine. (Pen. Code, § 1203.073, subd. (b)(2).)

### Prosecution's Case-in-Chief

On September 24, 2008, at 7:58 a.m., nine uniformed law enforcement officers from a narcotics task force, wearing helmets and vests labeled " 'POLICE,' " executed a search warrant at defendant's residence, of which she was the sole owner. The police were looking for methamphetamine.

The house had a wireless sensor on the walkway that would activate a doorbell sound on a receiver in a downstairs bedroom when anyone approached the house.

Department of Justice (DOJ) Special Agent Monty Cervelli testified that, as they approached the house, through a window he saw defendant look out, make eye contact with him with a look of panic on her face, turn and run upstairs.[1] The officers knocked

---

[1] Special Agent Cervelli acknowledged that his written report said "it appeared that [defendant] saw [our] approach and ran upstairs." The written report did not mention that defendant made eye contact or had a panicked look. The agent said he does not include every single detail in his reports but records everything he considers important at the time.

on the door, which popped open, announced themselves as police with a search warrant, and entered the house. Special Agent Cervelli twice yelled upstairs for defendant to come down. After a short delay, she did so.

In addition to methamphetamine, the officers were looking for three people -- defendant, Ronald Rhoades, and David Hernandez -- but only defendant was in the house. When Special Agent Cervelli asked her about the two men, defendant said Rhoades stayed at the house occasionally, but she did not know Hernandez. Cervelli had driven by the house periodically for two or three weeks before the search and had twice observed Rhoades's pickup truck parked there.

In the upstairs loft bedroom, which had a bed with pillows and blankets,[2] the police found methamphetamine, items associated with methamphetamine sales, firearms and ammunition. On the bedroom floor near the foot of the bed was a briefcase. On top of the briefcase was an open plastic baggie containing approximately one ounce (27.39 grams) of methamphetamine, a half teaspoon measuring spoon, and a playing card. The briefcase contained an unloaded .38-caliber revolver in a holster, a speed loader with five .38-caliber rounds, a manila envelope with six coin baggies containing methamphetamine, three packages of new coin baggies, a bundle of used packing material with methamphetamine residue, and three scales. Each of the six baggies in the manila envelope had a net weight between 10.37 and 19.95 grams. Situated on the bedroom floor by the briefcase was another scale and coin baggie of methamphetamine. Coin baggies are typically used as packages in which methamphetamine is sold. Measuring spoons are used to transfer drugs from a larger container for measurement and then place them into smaller containers for sale. Playing cards are used to cut, move out, and sort certain drugs before weighing. Cervelli opined that the scale on the floor by the

_____

[2] Special Agent Cervelli testified that the bedding was "disheveled" and "messed up," but he did not know whether anybody had slept in it.

coin baggie and the open bag of methamphetamine on the briefcase was used to weigh methamphetamine. A gold colored cosmetic bag was located on top of a dresser in the bedroom. The cosmetic bag contained two baggies of methamphetamine weighing a total of approximately 10.2 grams, a larger plastic bag, and three ziplock bags containing new coin baggies, some of which were in their original packaging, as well as a $100 bill. In the loft bedroom, the police also found an unloaded .25-automatic pistol with attached magazine as well as .38 and .22 ammunition on a shelf of the TV stand near the dresser, and a .22-caliber rifle leaning against the wall. The police did not fingerprint any of the items they collected because there was no indication of any suspect other than defendant. The walk-in closet in this bedroom contained only women's clothes and a W-2 statement and a US Bank statement, both in defendant's name. The dresser contained only women's clothes as well. The officers did not find anything indicating Rhoades or Hernandez lived at the house.

In the downstairs living room, there were comforters on the couches. One of the couches also had a pillow. The officers found a glass pipe on the downstairs desk and a glass pipe in defendant's purse on a countertop. Next to the purse was a pink cell phone, which was charging. The phone contained text messages that appeared drug-related, such as a message from a "Bo M" (aka Samra Mitchell) which said, "Hello. Can't help but to say not happy with the bag of crap you gave me Sunday. Don't mean to complain. *I'm sure you get that a lot*, but the average tweak I am not. I know I owe you. Could always say Bo, no more till I pay. Then at least that day I won't have to say Hey, *I don't want to pay* for garbage offed on me that way." (Italics added.) Police also found a shotgun in the closet of the downstairs bedroom, which had a bed that appeared unused.

The total amount of methamphetamine found in defendant's home was 117.75 grams net weight. Special Agent Cervelli opined the methamphetamine was possessed for sale, based on the amount, the scales, the packaging, firearms, sensor system, and text messages.

4

**Defense Evidence**

Defendant testified. At the time of her testimony, she had been working as an assistant bookkeeper for six months. Before that, she had a variety of jobs. She testified that she had a relationship with Rhoades, who sort of lived with her, but he did not help pay for anything. They argued a lot. She told him to leave several times. He would leave but then come back, and she would let him.

Defendant denied selling methamphetamine. She also denied talking to Rhodes about helping him sell drugs and denied knowing that he was selling drugs. Referring to both Rhodes and herself, defendant said, "Nobody's selling drugs." She admitted she had used drugs. She "smoked a little bit of pot" in college. She said she used methamphetamine before she got involved with Rhoades, but only once, when she was a bartender around 1997, and it was given to her by a coworker. Defendant said she has never purchased methamphetamine. She got it free from Rhoades. She initially did not know that Rhoades used methamphetamine. About two or three months after he moved in with her around 2004 or 2005, a friend told her that Rhoades used the drug. Rhoades offered defendant some and she accepted. After that, she used methamphetamine with Rhoades two or three times a month. She would snort it; he would smoke it in a glass tube. He always provided the drug; she never did.

Defendant discussed her presence in the loft bedroom in the days before the search. She and Rhodes argued two days before the search and he left the house with his things, which she had already packed. Later that evening, defendant went to the loft bedroom to get some clothes for the next day. She did not see any briefcase, baggies, or scales on the floor. It was her habit to sleep on the downstairs couch. The next morning, a friend picked her up to go to Redding to shop and run errands. Defendant got ready in the downstairs bathroom that morning and did not go upstairs. Defendant and her friend returned around midnight or 1:00 a.m. After talking with her friend for awhile, defendant

5

fell asleep on the downstairs couch. Defendant did not go upstairs to the loft bedroom that night.

Defendant testified that the following morning, she heard the motion sensor. Thinking it might be Rhodes, she ran upstairs with the intent to put on a robe because if Rhoades saw her dressed that early, he would think she had been out all night and would start an argument. She denied looking out of the window and said she did not see anyone outside. Defendant had earlier testified that she had the sensor installed because the house had a lot of windows, including a bathroom window that was near the front door and she wanted to know if someone was at her door when she was in the bathroom. Defendant said that when she ran up the stairs, she did not get any further than "about up to the top of the stairs" when Special Agent Cervelli ordered her to come down. She testified that she did not see anything in the loft at that time because it was dark in the room and she did not walk all the way in.

Defendant denied ever seeing the baggie containing an ounce of methamphetamine that was on top of the briefcase and did not know the briefcase had been left in the middle of the bedroom floor. She also said the gold colored cosmetic bag on the dresser containing the two bags of methamphetamine did not belong to her. She said she had no idea why the distinctive red markings on one of the baggies in the cosmetic bag matched the markings on some of the baggies found in the briefcase. She testified the substance in the baggies in the manila envelope in the briefcase came from Billy Paul, who was a cook at a truck stop where defendant and her friend Lorey Rosetto would stop when they went shopping. Around three years before her arrest in this case, defendant and Lorey visited Paul, who pulled out a plastic bag of what looked like methamphetamine. Defendant tasted it. It did not taste like methamphetamine. "It was just a joke." He threw it into the back of her truck. She took it home, intending to give it to a friend as a joke. The plastic bag had ripped. She put the contents into smaller bags and put them in a manila envelope, which she placed in a slot in Rhoades's briefcase in

6

the bedroom, so her daughter would not see it.  Nothing else was in the briefcase except some old work papers and "stuff."  After that, defendant forgot it was there -- until the police were searching her house, when she remembered and blurted out that it was not real.

Samra Mitchell, who said she sent the text message set forth *ante*, testified she is Rhoades's cousin and defendant's close friend.  She volunteered that the only thing that could make her and defendant closer is if defendant were her blood sister.  Mitchell denied using drugs and said she never saw any methamphetamine at defendant's home.  Mitchell said she is subject to random drug tests at her jobs as a truck driver and heavy equipment operator and has never been notified of a positive test in 16 years.  She acknowledged, however, that she works for a small, family-owned business.

Consistent with defendant's testimony, Mitchell said she and defendant had a hobby of "bottle digging" at the dump, looking for items of value or interest.  Mitchell said her text message was not about drugs; it referred to splitting up the bags of bottles and items she and defendant had gathered while bottle digging, and Mitchell wondered whether defendant withheld the better items because Mitchell owed her $100 on a loan to buy clothes for Mitchell's children.  Mitchell said her statement that she was not "the average tweak," meant she was not the "average piece of crud around town."  Mitchell said "tweaker" is a drug user but claimed "tweak" does not have a drug connotation.  When asked why she wrote that she was sure defendant got a lot of complaints, Mitchell responded, "Just trying to put words in that was going to fill the gaps and rhyming and . . . ."  She did not think that defendant got a lot of complaints about bottles or things that were the subject of the text message.  She testified that one of the reasons she enjoyed bottle digging is because "you're not putting out any money to buy anything that you find and it's free" -- the bottles did not cost money.  She provided no explanation why the text included the words, "*I don't want to pay* for garbage offed on me that way."  (Italics

7

added.)  Mitchell testified that even though she was great friends with defendant she "wouldn't lie for anybody that does any kind of drugs or breaks the law."

The defense also called as a character witness for Mitchell her good friend, Garret Martinez, who testified Mitchell is an honest person.

Billy Paul testified he found a plastic bag inside a paper bag at the truck stop where he worked.  He thought it was a controlled substance, maybe methamphetamine, but he smelled it, and it did not smell like anything, and he dropped it into a glass of water because he heard drugs are "supposed to dissolve or do something," but it did not dissolve.  He threw it into the back of defendant's pickup truck.  Paul admitted a 1997 felony conviction for marijuana possession for sale but testified he no longer deals drugs.  He had used methamphetamine in the past but has not used it for a couple of years.  Paul testified he and Rhoades used guns for hunting.  The jury heard a stipulation that Paul told defense counsel that he (Paul) " 'used drugs occasionally and used drugs with [defendant]' " and that he " 'tasted the substance in the baggy that he found at Pollard Flat and that it was not drugs, but it looked like drugs.' "

The defense called as a witness forensic toxicologist Jeffrey Zehnder, who testified his laboratory tested samples received from law enforcement which came from the baggies found in defendant's home.  The samples contained methamphetamine and dimethyl sulfone, a dietary supplement used as a cutting agent to maximize drug profits.  His lab determined that the percentages of methamphetamine in the samples taken from the six baggies in the manila envelope were 2, 18, 0.54, 0.18, 1.3, and 0.19, respectively.  Zehnder himself retested two of the samples and got different results -- 0.3 percent instead of 0.18 percent, and 0.44 percent instead of 0.19 percent, which suggested that the samples had not been mixed well before testing.  The witness doubted whether these small percentages would be enough to get a drug abuser high.  However, the substance in the open bag found on top of the briefcase contained 46 percent methamphetamine and Zehnder opined that a user could obtain an effect from that substance.

8

The defense also called as a witness Dr. Stephen Pittel, a forensic psychologist who testified as an expert in the use, dealing, and distribution of controlled substances. Dr. Pittel testified that methamphetamine dealers use a cutting agent, typically a white crystalline powder, to dilute the drug so that typically 60 to 80 percent of a small package would be methamphetamine, 20 to 40 percent would be cutting agent. Dr. Pittel opined it was inconceivable that a drug dealer would cut methamphetamine to such low percentages as were found in some of the baggies found in defendant's home, e.g., 18 percent, two percent, and less. Dr. Pittel gave several reasons for his opinion: methamphetamine has a pungent odor and taste and a user would immediately know the substance is not methamphetamine; dealers normally have a regular clientele and their customers would be highly incensed if someone tried to sell them something that was largely an inert substance; users develop a tolerance, so they need 60 to 80 percent methamphetamine to obtain the desired effect. Dr. Pittel opined that it was more likely that someone put a cutting agent into bags that had some methamphetamine residue in them.

Dr. Pittel acknowledged, however, that some people might sell impure methamphetamine on the streets. The term "bunk" describes this "bad dope" and Dr. Pittel acknowledged that bunk is sold and dealers get complaints from their customers. He further admitted that the presence of packing materials, security alarm, guns, and a large quantity of methamphetamine would be indicative of drug sales.

Dr. Pittel also acknowledged that he coauthored an article having to do with how to make a drug defendant look sympathetic to a jury.

### Prosecution's Rebuttal Evidence

DOJ narcotics agent Ross Martin, who qualified as an expert in methamphetamine trafficking, testified that even though the six baggies found in the manila envelope contained very small percentages of methamphetamine, he believed they were possessed for sale, because the substance had been split into six baggies, and he had never seen

9

cutting agents individually packaged in that manner. He also testified that he would not expect a methamphetamine dealer to leave a stash with someone else unprotected, because so much goes into acquiring the drug. He said such conduct just defies everything he had ever been taught or experienced.

## Verdict and Sentencing

The jury found defendant guilty of the single count of possession for sale and found true the allegations for being armed with a firearm and excess amount of substance containing methamphetamine.

On February 1, 2012, the trial court imposed a sentence of two years for possession for sale plus four years for the firearm enhancement, for a total of six years, but the court suspended execution of sentence and placed defendant on probation for three years with various conditions, including serving 365 days in jail but with the opportunity to serve the balance in excess of 180 days in a work program.[3]

## DISCUSSION

### I. Impeachment of Defense Expert

#### A. Background

Before Dr. Pittel testified, the trial court ruled outside the jury's presence that the prosecution would be allowed to impeach Dr. Pittel, over defense objection, with the fact he was arrested snorting cocaine during a recess in an unrelated criminal trial in which he was testifying as an expert. The incident occurred 20 years earlier.

The prosecutor argued the expert's use of cocaine during a court recess was a bad act which showed contempt for the court and went to the expert witness's credibility, and the arrest had been admitted in other court cases in which Dr. Pittel had testified. The

---

[3] The record is unclear as to the disposition of the probation denial allegation for possession for sale of more than 57 grams of a substance containing methamphetamine (Pen. Code, § 1203.073, subd. (b)(2)).

defense countered that the evidence had only been admitted in four or five of the two or three hundred cases in which Dr. Pittel had testified, perhaps because of facts specific to those cases. The defense argued the arrest should be excluded under Evidence Code section 352, because it was too remote, was only an arrest, not a conviction, did not show or involve moral turpitude, and was so tangential as to be completely outweighed by the prejudice.

The trial court ruled it would allow the question as framed in chambers -- that Dr. Pittel was arrested for the use of cocaine and the arrest took place during the recess in a case in which he was testifying as an expert -- because "there may be some implication of bias by Dr. Pittel's recreational use in the past of controlled substances and that it would be used for impeachment in that fashion."

Thereafter, defense counsel introduced the evidence in front of the jury, asking on direct examination, "In 1990 or 1991, Dr. Pittel, were you arrested for the use of cocaine during a recess of a court case during which you were testifying as an expert in a drug case?" Dr. Pittel answered, "Yes." On cross examination, the prosecutor asked, "Dr. Pittel, weren't you arrested while you were snorting cocaine in your car during testimony as an expert witness in a case in California?" Dr. Pittel answered, "During the lunch break, yes."

### B. Analysis

Defendant argues the trial court erred in allowing the prosecution to impeach Dr. Pittel with a 20-year-old arrest. We disagree.

We review the trial court's rulings on admissibility of evidence under an abuse of discretion standard. (*People v. Harris* (2005) 37 Cal.4th 310, 337 (*Harris*).)

On appeal, defendant argues the incident did not involve moral turpitude (*People v. Castro* (1985) 38 Cal.3d 301, 317 [simple possession of drugs does not involve moral turpitude]; *People v. Franco* (2009) 180 Cal.App.4th 713, 722), was not relevant to show bias in his testimony as an expert regarding distribution and sales of methamphetamine

11

on the issue of intent to sell, and was unduly prejudicial because of remoteness in time and because it confused the issues and misled the jury when they learned the arrest occurred during a trial in which Dr. Pittel had testified as an expert.

We need not discuss moral turpitude, because the trial court did not abuse its discretion in allowing the evidence as relevant to bias. In determining the credibility of a witness, the jury may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony, including the existence of bias. (Evid. Code, § 780, subd. (f); *Harris, supra*, 37 Cal.4th at p. 337.) Clearly, the fact that the witness possessed and used a controlled substance during a break in his testimony in court in another criminal case in which he presented himself as an expert witness -- no matter how long ago it happened -- is something from which jurors could conclude that the witness was biased in favor of the defendant charged with a drug offense.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Importantly, "evidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*People v. Holford* (2012) 203 Cal.App.4th 155, 167.)

Although the arrest was old, the evidence was short, was not confusing, and was not likely to mislead the jury or prejudice defendant. Defendant cites *People v. Burns* (1987) 189 Cal.App.3d 734, 738, in which the court held that a 20-year-old conviction "meets any reasonable threshold test of remoteness" related to the admission of a criminal defendant's prior felony conviction for impeachment purposes where it was an isolated incident followed by a legally blameless life. Defendant asserts that there was no evidence of any other bad acts by Dr. Pittel. Defendant's reliance on *Burns* is misplaced.

12

First, that case involved the admissibility of a prior felony conviction for impeachment (see Evid. Code, § 788), not the admissibility of criminal activity to prove bias. Second, the evidence in that case was admitted to impeach a criminal defendant, which presents considerations that are not applicable to impeaching a witness, including concerns related to the inflammatory nature of the conviction and the prejudicial impact of such evidence. Thus, the remoteness factor was applied in an entirely different context in that case. Third, the appellate court reversed in *Burns* because the trial court mistakenly believed it was *required* to admit evidence of the 20-year-old robbery conviction under Proposition 8, whereas the trial court had discretion to exclude it. The appellate court remanded to the trial court to exercise its discretion and for the guidance of the trial court listed factors the trial court "may consider," including the defendant's conduct subsequent to the prior conviction. (*Burns*, at pp. 737-739.)

Here the witness was not a criminal defendant. Thus, there was no concern that the conviction could be used by the jury as evidence of predisposition to commit the charged crime. Nor was the conviction likely to inflame the jury and prejudice the jurors against defendant. The evidence was probative of bias and no Evidence Code section 352 counterweight "substantially outweighed" that probative value.

Defendant argues the jury may have misused this evidence as propensity evidence that the witness was likely to commit a similar act during defendant's trial. We disagree. The trial court instructed the jurors that, if they found a witness had committed a crime or other misconduct, they may consider that fact *only* in evaluating the credibility of the testimony. The jury was further instructed the fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair the witness' credibility and it was up to the jurors to decide whether such fact made the witness less believable. We presume the jurors understood and followed the court's instructions (*People v. Gray* (2005) 37 Cal.4th 168, 231 (*Gray*)), and defendant offers nothing to rebut the presumption.

13

We conclude the trial court did not abuse its discretion in allowing the evidence concerning Dr. Pittel's arrest.

## II. Claims of Prosecutorial Misconduct Concerning Cross-Examination of Defendant and the Prosecution's Closing Argument

Defendant contends the prosecutor engaged in misconduct by asking defendant on cross-examination whether Special Agent Cervelli had lied during his testimony. Defendant further complains that the prosecutor referred to those questions in closing argument and argued that defendant's testimony "essentially accused Cervelli of being a liar." Recognizing these matters are forfeited by failure to object in the trial court, defendant claims ineffective assistance of trial counsel. We see no basis for reversal.

### A. Background

Defendant quotes four parts of her cross-examination:

"[Prosecutor:] . . . [C]an you explain how the meth pipe got into your purse?

"[Defendant:] There was no meth pipe in my purse.

"[Prosecutor:] So you were in the courtroom when Agent Cervelli testified that one was found in your purse; were you not?

"[Defendant:] Yes, I was.

"[Prosecutor:] So are you saying that that's a false statement that he testified to?

"[Defendant:] Yes, it is."

-----------------------

Six transcript pages later, the following took place:

"[Prosecutor:] Is it your testimony that you did not look out the window that morning when the police came?

"[Defendant:] I did not look out the window that morning, no. I assumed it was [Rhoades] coming.

14

"[Prosecutor:]  When Officer Cervelli testified, do you recall him saying that he saw you through the window and he saw you -- and that you and he made eye contact? Do you remember him testifying to that?

"[Defendant:]  Yes.

"[Prosecutor:]  And it's your -- is it your testimony now that that's a false statement that he testified to?

"[Defendant:]  I did not make eye contact with anybody coming up my stairs that morning."

------------------------

Two transcript pages later, the following took place:

"[Prosecutor:]  Do you recall him testifying that he had to yell out a couple of times before you appeared?

"[Defendant:]  I don't remember him yelling out a couple of times.  I remember him saying, 'Come downstairs.'

"[Prosecutor:]  But he testified that you weren't at the top of the stairs; is that --

"[Defendant:]  That's wrong.

"[Prosecutor:]  -- a false statement?

"[Defendant:]  Correct."

------------------------

Eighteen transcript pages later, the following took place:

"[Prosecutor:]  When Officer or Agent Cervelli approached you at your home on the date of the arrest and asked you about Mr. Rhoades, why did you tell him that he only stays there occasionally?

"[Defendant:]  I never said that.

"[Prosecutor:]  So was that also a false statement?

"[Defendant:]  That is a false statement.  Yes, it is.

"[Prosecutor:]  What did you say?

15

"[Defendant:] They asked me where [Rhoades] was at. I said, 'I don't know. We've been arguing the last couple of days. He hasn't been here.' I said, 'He might be at work.' "

------------------------

Defendant also cites closing argument, in which the prosecutor told the jury: "[Defendant] denied making eye contact with Agent Cervelli. So in order for her to be telling the truth, *then Agent Cervelli has to be lying*. [¶] *Why would he lie and put his career in jeopardy* about making eye contact with the defendant and shouting to his coworkers, co-policemen, giving them a warning so their safety may be protected because he saw somebody moving in the house? He saw someone through the window. Their safety was compromised. *Why would he make up the fact* that he saw her through the window, and made eye contact with her? [¶] Who has the motivation to not tell the truth here? It's the defendant. She's the one in trouble. She's the one who needs to make up a story, come up with something different, so that she could say the People have not proven the facts of her case. [¶] "She also testified that she stopped at the top of the stairs and she did not see the meth on the briefcase on the floor. She said she went up to change clothes, I believe, because Ronnie, who she was in a fight with, was coming over. But she didn't make it far enough. And I believe she said she thought it was dark, so she didn't see a baggy of methamphetamine sitting on the briefcase. Well, that also does not match with what Agent Cervelli testified to. [¶] Agent Cervelli testified that when they came in the house, the defendant was no longer downstairs. He'd seen her run up the stairs through the window, went to the bottom of the stairs and he looked up and he did not see her. He shouted a couple or more times -- let's just say a couple -- loudly. And eventually, after a short period, she came down. But his testimony is that she did not stop at the top of the stairs, he would have seen her. [¶] *So for her to be telling the truth, again, Agent Cervelli has to be lying. And why would he put his career on the line*? What she is doing is she is trying to make up an excuse as to why she -- to match her

16

claim that she didn't see the methamphetamine because, of course, she would have gone to the closet. And you can see in the photo you have to go right through that area to get to the closet. To get her clothes, she would have tripped over the briefcase most likely. She would have seen the methamphetamine. So her story is she stopped right there. And that's convenient, but it's not the truth." (Italics added.)

## B. Analysis

As defendant concedes, she forfeited her claim of prosecutorial misconduct by failing to object in the trial court. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) As a result, she frames the contention as one of ineffective assistance of counsel.

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never an easy task' " (*Harrington v. Richter* (2011) 562 U.S. 86, ___ [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

### 1. Failure to Object to Cross-Examination Questions

Defendant argues there could be no satisfactory explanation for trial counsel's failure to object to the prosecutor's purportedly improper cross-examination of defendant as to whether Special Agent Cervelli was lying. However, we conclude that the prosecutor's questions (none of which were "was he lying" questions), in and of themselves were not objectionable and did not amount to misconduct. Thus, there was no reason to object to the questions, and counsel's performance was not deficient for not having done so.

To establish that counsel's failure to object violated defendant's constitutional right to effective assistance of counsel, defendant must first establish that the prosecutor's

17

cross-examination was objectionable and constituted prosecutorial misconduct. For this, defendant relies heavily on *People v. Zambrano* (2004) 124 Cal.App.4th 228, in which the court concluded a prosecutor committed misconduct in *repeatedly* asking the defendant whether two undercover officers were lying about his participation in a drug transaction, but also concluded the prosecutorial misconduct was harmless. We note that *Zambrano* did not involve a claim of ineffective assistance of counsel and our review is thus somewhat different from the analysis the *Zambrano* court employed where the trial court overruled defense counsel's objections. Moreover, for the reasons we discuss *post*, there are other reasons why *Zambrano* is distinguishable from this case.

In *Zambrano*, two undercover police officers testified they contacted a woman at a truck stop parking lot about buying rock cocaine. (*Zambrano*, *supra*, 124 Cal.App.4th at p. 233.) She brought them over to the defendant. At her direction, they put $20 on a truck bed. Defendant removed rock cocaine from his bag and handed it to the woman, who handed it to one of the undercover officers. (*Ibid*.) As defendant took the $20, the officers arrested him. The defendant testified he was working at the truck stop cleaning trucks. "He denied possessing, selling, or seeing any drugs, denied having any conversation with [the woman], denied engaging in any drug transaction, and denied seeing or taking any money." (*Ibid*.) He said one of the men walked up to him, said something he did not understand, put a gun to his neck, threw him on the ground, and handcuffed him. (*Ibid*.)

The prosecutor cross-examined the defendant:

" 'Q So when Corporal Escarpe testified that you gave cocaine to Lulann East and she gave the cocaine to him, he was lying?

" 'A I never had drugs on me and, um, and I did not see any money.

" 'Q Okay. When Corporal Escarpe testified that you gave rock cocaine to Ms. East, who in turn gave the cocaine to him, that he's, Corporal Escarpe, is lying?

" 'A That what, that she handed it to him?

18

" 'Q  Yes.

" 'A  I did not see the lady hand him something. . . .

" 'Q  So in your version of events today, what you're telling the jury is that the only thing Corporal Escarpe testified to truthfully was the fact that you were arrested that night?

" 'A  Yes ma'am.

" 'Q  So Corporal Escarpe is lying about everything he testified to except for the fact that you were arrested that night?

" '  Yes.

" 'Q  And Officer Dorsey is lying about everything that took place that night except for the fact that you were arrested October 10th, 2001, correct?

" 'A  Yes, ma'am.

" 'Q  So what you want this jury to believe is that Officer Dorsey and Corporal Escarpe are going to risk their jobs and come in here and lie to them?

" '[DEFENSE COUNSEL]:  Objection, relevance.  Speculation.

" 'THE COURT:  Overruled.  [¶] You can answer it, sir.

" 'THE WITNESS:  I don't know if they are going to lose their jobs or not.  I— what I am telling you is that I had no drugs nor do I use drugs. . . .

" 'Q  So everybody is lying except for you?

" 'A  Like I tell you, ma'am, I never had drugs and I never received money from no one, nor did I see money either.

" 'Q  Well, you didn't answer my question, though, Mr. Zambrano, did you?  I asked you, everybody is lying but you today?

" 'A  Yes, ma'am.' " (*Zambrano*, *supra*, 124 Cal.App.4th at pp. 234-235.)

The prosecutor in *Zambrano* then called Escarpe as a rebuttal witness and had him testify that he did not lie on the witness stand.  He further testified that he worked for the

19

police department for 15 years and would be fully discredited and likely terminated if he lied on the witness stand. (*Zambrano*, *supra*, 124 Cal.App.4th at p. 235.)

In rebuttal argument to the jury, the prosecutor argued that defendant had a motive to lie, but the officers had no motive to lie and would risk their careers if they lied. (*Zambrano*, *supra*, 124 Cal.App.4th at p. 236.)

The *Zambrano* court noted that courts have reached varying conclusions as to whether it is misconduct for a prosecutor to ask a defendant on cross-examination whether another witness was lying. (*Zambrano*, *supra*, 124 Cal.App.4th at p. 238.) One line of cases held that the question is always misconduct because it infringes on the jury's right to make credibility determinations or because the question is misleading in suggesting the only explanation for a discrepancy between the defendant's testimony and another witness's testimony is that one of them is lying. (*Id*. at pp. 238-239.) Another line of cases held that the question is not misconduct because it merely emphasizes the conflict in the evidence, which it is the jury's duty to resolve. (*Id*. at p. 239.) A third line of cases held that the question is neither categorically improper nor categorically proper, but is proper under certain limited circumstances, e.g., when the only possible explanation is that one or the other is lying, or when the defendant has opened the door during direct examination by testifying about the veracity of other witnesses, or when the question has a probative value in clarifying a particular line of testimony. (*Ibid*.) Under the third line of cases, "it is useful to distinguish between the admissibility of the evidence that 'were they lying' questions seek to elicit, and the broader question of whether and, if so, under what circumstances asking such questions constitutes prosecutorial misconduct." (*Ibid*.)

The court in *Zambrano* adopted the third approach and concluded the prosecutor's "were they lying" questions in that case elicited inadmissible evidence. (*Zambrano*, *supra*, 124 Cal.App.4th at pp. 239-241.) The questions were not relevant to any issue in the case. They did not clarify the defendant's testimony, because he had already testified

20

that his recollection differed from the officers' in every material respect. (*Id*. at p. 240.) Nor did the questions inquire into any facts or circumstances surrounding the defendant's testimony, or develop independent evidence which ran contrary to his testimony. The questions served no purpose other than to elicit the defendant's inadmissible lay opinion concerning the officers' veracity. The questions merely forced him to opine, without foundation, that the officers were liars. (*Id*. at p. 241.)

The *Zambrano* court next considered whether the questions constituted prosecutorial misconduct. (*Zambrano*, *supra*, 124 Cal.App.4th at p. 241.) A prosecutor has a duty to refrain from improper methods calculated to produce a wrongful conviction. (*Ibid*.) A prosecutor's intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (*Ibid*.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade the jury. (*Ibid*.) Even if a "were they lying" question calls for an inadmissible opinion on another person's veracity, asking one or two such questions, if necessary to clarify a witness's testimony, is not necessarily a reprehensible method of jury persuasion. (*Id*. at p. 242.)

The court in *Zambrano* held there was prosecutorial misconduct in that case, because the jury must have understood that the defendant was categorically denying the officers' version of the events surrounding the drug transaction, and the jury would have to decide who was telling the truth, yet the prosecutor "repeatedly and painstakingly asked defendant whether the officers were 'lying' about every aspect of their testimony that differed from defendant's testimony. She used the questions to berate defendant before the jury and to force him to call the officers liars in an attempt to inflame the passions of the jury. This was misconduct. [¶] The misconduct was exacerbated when

21

the prosecutor called [an officer] in rebuttal to testify that he was not lying and would not risk losing his job by lying." (*Zambrano*, *supra*, 124 Cal.App.4th at p. 242.)

The approach adopted by *Zambrano* as to "were they lying" cross-examination questions was later endorsed by the California Supreme Court in *People v. Chatman* (2006) 38 Cal.4th 344, 384 (*Chatman*). *Chatman* teaches that trial courts should carefully scrutinize "were they lying" questions in context. (*Ibid*.) Such questions "should not be permitted when argumentative, or when designed to elicit testimony that is irrelevant or speculative. However, in its discretion, a court may permit such questions if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*Id*. at p. 384.) For example, "[a] defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he might also be able to provide insight on whether witnesses whose testimony differs from his own are intentionally lying or are merely mistaken." (*Id*. at p. 382.) Likewise, "[w]hen . . . the defendant knows the other witnesses well, he might know of reasons those witnesses might lie." (*Ibid*.) Additionally, it is permissible for the prosecutor to clarify the defendant's position. And it is also permissible "to ask whether [the defendant] knew of facts that would show a witness's testimony might be inaccurate or mistaken." (*Id*. at p. 383.)

*People v. Hawthorne* (2009) 46 Cal.4th 67, 98, abrogated on other grounds as stated in *People v. McKinnon* (2011) 52 Cal.4th 610, 637, illustrates when "were they lying" questions might be permissible. In *Hawthorne*, the defendant testified he was a mere bystander who rode off on a victim's bicycle as the victim fought with two people who had ordered the victim off the bicycle. (*Hawthorne*, at p. 96.) Contrary to a deputy sheriff's testimony about arresting two suspects at the scene, the defendant testified he was arrested alone elsewhere. The prosecutor asked the defendant if the deputy had lied.

22

The defendant said he was not calling the deputy a liar but the deputy's statement was incorrect. (*Id*. at p. 97.) When asked to explain the difference in the testimony, the defendant said he was the person arrested; the deputy was not. (*Ibid*.) The Supreme Court found the questioning proper. "In asking whether [the deputy] lied, the prosecutor sought to clarify defendant's testimony, giving him the opportunity to explain the divergent testimony. Defendant explained that his version was more accurate because he, not [the deputy], was the person arrested. Thus, the cross-examination was legitimate inquiry to clarify defendant's position." (*Id*. at p. 98.)

The cross-examination here is in contrast to that in *Zambrano* and those differences must be recognized in determining whether trial counsel was deficient for failing to object. First, defendant was not asked the question, "was he lying?" He was asked whether the officer's statements were "false." The word "false" can mean intentional deception, but it is also defined as "based on mistaken ideas" and can connote inaccuracy.[4] Second, the questions related to specific facts and circumstances about which defendant testified. Third, there were far fewer questions here than in *Zambrano*. As the *Zambrano* court recognized, even one or two "were they lying" questions does not rise to the level of prosecutorial misconduct. (*Zambrano*, *supra*, 124 Cal.App.4th at p. 242.) Fourth, unlike the multiple and back-to-back "were they lying" questions in *Zambrano*, the four areas of questioning about which defendant complains here were separated by six, two, and eighteen pages of defendant's responses to other questions. Fifth, the questions here could be reasonably construed as providing an opportunity for defendant to explain or expound on her earlier answers. In this regard, the questions

---

[4] False is defined as follows: "not real or genuine [¶] [] *not* true or *accurate*; *especially*: deliberately untrue: done or said to fool or deceive someone [¶] [] *based on mistaken ideas*." (Merriam-Webster's Dictionary (2015) <http://www.merriam-webster.com/dictionary/false> [as of 10-21-15], first, second, and fourth italics added.)

were more like those found to be permissible in *Chatman* and *Hawthorne* than the impermissible cross-examination in *Zambrano*. As we have noted, our high court in *Chatman* has said trial courts may permit "were they lying" questions "if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*Chatman*, *supra*, 38 Cal.4th at p. 384.) While, in the context of the closing argument the prosecutor later gave here, the questions addressed to defendant could be viewed as amounting to questions about whether Special Agent Cervelli was lying, at the point in time they were asked, the questions left room for defendant to explain the discrepancy identified in the questions. Thus, at the time the questions were posed, any objection would likely have been overruled. Counsel was not deficient for failing to object at this point.

## 2. Failing to Object to Closing Argument Comments

Next, we consider whether trial counsel's failure to object to the closing argument was constitutionally ineffective assistance of counsel. In making this determination, we acknowledge that the questions asked by the prosecutor on cross-examination took on a more problematic complexion in closing argument. As noted *ante*, the prosecutor argued to the jury, "in order for [defendant] to be telling the truth, then Agent Cervelli has to be lying." The prosecutor went on to pose questions during argument such as: "Why would he lie . . . [w]hy would he make up the fact that . . . [¶] . . . [¶] . . . for her to be telling the truth, again, Agent Cervelli has to be lying. And why would he put his career on the line?"

In *Zambrano*, the court noted that the prosecutor's cross-examination misconduct was "further compounded" by the prosecutor's closing argument to the jury, where the prosecutor attacked the defendant's credibility, noting he had testified that the only thing the officers were telling the truth about was the fact that he was arrested. (*Zambrano*, *supra*, 124 Cal.App.4th at p. 242.) The *Zambrano* court concluded that while the

24

prosecutor's misconduct was not so egregious as to deny due process, it was reprehensible and constituted misconduct under state law. (*Id*. at p. 243.) However, the court found that the misconduct was harmless because it was not reasonably probable the jury would have a reached a result more favorable to the defendant had the misconduct not occurred. (*Ibid*.) The defendant's version was patently unreasonable. He denied seeing any drugs or money and claimed that one of the officers simply walked up to him, said something he did not understand, put a gun to his neck, threw him on the ground and handcuffed him. (*Ibid*.) He offered no explanation as to why the officer may have acted as he did.[5] (*Ibid*.)

---

[5] We note that in an unpublished case, Zambrano was later granted a conditional writ of habeas corpus by a federal district court, upheld by a federal appeals court two months before defendant filed his opening brief in our case. (*Soldana Zambrano v. Prosper* (9th Cir. 2012) 481 Fed.Appx. 300 [2012 U.S. App. Lexis 10297] (*Soldana Zambrano*), not selected for publication in the federal reporter.) While we may consider this unpublished opinion (Cal. Rules of Court, rule 8.1115(b)), it does not impact our resolution of this appeal. The Ninth Circuit concluded that the prosecutorial misconduct violated the defendant's federal due process rights, because the misconduct was *pervasive* and purposeful; by overruling the defense objections, the trial court signaled to the jury that the questioning was proper; defense counsel had no opportunity to object to improper argument because it occurred during rebuttal; the only evidence of guilt was the officers' testimony; and the inadmissible material about losing their jobs was directed precisely at bolstering the officers' credibility. (*Soldana Zambrano*, at pp. 302-303.) The Ninth Circuit said the evidence called the officers' testimony into question, because one of them testified the woman spoke to the defendant in English, but the defendant does not speak English. (*Id*. at p. 302.) The Ninth Circuit's observation on this point was not totally accurate, because the defendant testified he understood a little English. (*Zambrano*, *supra*, 124 Cal.App.4th at p. 233.) In any event, the Ninth Circuit concluded that the prosecutorial misconduct was prejudicial because the due process violation was "highly likely" to have affected the verdict; every reasonable jurist would at least have a grave doubt about whether the misconduct substantially influenced the verdict; and the only evidence linking the defendant to the sale of cocaine was the officers' testimony. (*Soldana Zambrano*, at p. 303.) While the Ninth Circuit essentially concluded the prosecutorial misconduct was not harmless because it violated due process, it did not rule that harmless error analysis cannot be applied to prosecutorial misconduct claims involving improper "were they lying" questions and closing argument. Nor did it address

25

Here, assuming the prosecutor's closing argument was prosecutorial misconduct under federal or state law, and further assuming trial counsel was deficient for failing to object to it, there is no basis for reversal, because defendant has not established prejudice by showing it is reasonably probable that she would otherwise have obtained a more favorable result.

Where we can dispose of an ineffective assistance of counsel claim on the grounds of prejudice, we need not address whether counsel's performance was deficient. (*In re Fields* (1990) 51 Cal.3d 1063, 1079.) To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, 178 L.Ed.2d at p. 642.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.)

Two of the four points raised by the questions about which defendant complains were inconsequential to the prosecution's case. The pipe in the purse made little difference, because defendant admitted using methamphetamine (though she claimed she snorted it rather than using a pipe). As to the question about Rhoades, defendant was equivocal about his status in her home even on her own direct examination.

The questions about defendant making eye contact with Special Agent Cervelli and whether she made it into the loft bedroom and was ordered to come out as opposed to getting to "about at the top of the stairs" involved factual issues that were more important to the case. Making eye contact and then disappearing into the loft bedroom showed a potential effort to hide or destroy the methamphetamine defendant knew was there. However, even without the purported "was he lying" questions on these points and the

the circumstance we have here, where we must determine whether the failure to object to the misconduct constitutes ineffective assistance of counsel.

26

prosecutor's argument, the issue the jury had to decide was clear -- whose testimony was credible, defendant's or Cervelli's? The prosecutor's cross-examination, defendant's answers and the prosecutor's argument concerning those questions and answers added little to the credibility issue. Nor did the answers to the prosecutor's questions add significant weight to the evidence against defendant relative to the other evidence.

The other evidence against defendant was overwhelming. Defendant admitted to bringing into the house a bag of what looked like methamphetamine, dividing it into small baggies, and telling the police it was not real, affirming her possession and knowledge of its presence. Her explanations about thinking it was not real, intending to pull a joke on friends, leaving it in the briefcase for years, forgetting it, and suddenly remembering it while the officers searched, lacked credibility. So too did her explanation about failing to see the open bag of approximately one ounce of substance containing 49 percent methamphetamine on the briefcase and the other items on the floor in plain view. Her testimony suggests that Rhodes entered her home while she was in Redding the day before the search, and because she never went upstairs when she returned from her outing, she was unaware the drugs and other items were on the floor. But it stretches credulity to think that Rhoades, to whom defendant purportedly never spoke about methamphetamine sales and who was not dealing methamphetamine according to defendant, came back to her house after being kicked out, engaged in an apparent operation of spooning his stash into smaller baggies and then left the open bag of methamphetamine in the middle of that operation for defendant to find when she returned to her home. Furthermore, the claim that the text message of the apparent complaint from her close friend about the quality of defendant's drugs was really a rhyming message concerning her friend's disappointment about her share of their joint bottle excavation activity also lacked credibility. Indeed, defendant's friend had no credible explanation for why she mentioned in the text that she was sure others had complained "a lot" and gave absolutely no explanation for why she complained about not wanting "to

27

*pay* for garbage offed on me that way." (Italics added.) There was a mountain of evidence against defendant, including the multiple baggies of methamphetamine, the packaging materials, scales, firearms and ammunition all found in her home. Although the prosecutor here did argue to the jury that Special Agent Cervelli would not put his career in jeopardy by lying, neither the questions nor the prosecutor's argument resulted in the prejudice required to establish ineffective assistance of counsel.

Defendant argues that, even under the reasonable probability standard, reversal is required, "[g]iven the testimony given by the character witnesses for the defense and the strength of appellant's testimony . . . ." Defendant overestimates the strength of her evidence. In fact, defendant herself undermined the credibility of her witnesses by eliciting testimony from her friends that they were unaware of any drugs in her home, despite the fact that defendant in her own testimony admitted using drugs.

We conclude that defendant has failed to show prejudice. Thus, she has failed to establish ineffective assistance of counsel.

### III.  Trial Court's Comment

Defendant argues her trial counsel rendered ineffective assistance of counsel by failing to object to a comment made by the trial court, which according to defendant, usurped the jury's function as ultimate factfinder and impliedly directed a verdict against defendant in violation of her Sixth and Fourteenth Amendment rights. We disagree.

### A.  Background

During the defense case, the trial court made the following comment before testimony of a defense witness: "All right. We're back on the record . . . . And for the record, all of the jurors and alternates are seated in their newly-assigned seats. The numbers are the same. The courtroom is different. And the court is gratified to know that we have a group of jurors who are very much interested in the apprehension of wrongdoers. [¶] And, counsel, that's a little joke. I'll let you see the reason for the joke after -- during hours."

28

No one objected.

The People acknowledge the transcript does not show the trial court's explanation of the joke. Consequently, the court's comment has become an issue on appeal.

### B.  Analysis

On appeal, defendant cites authority that the role of a judge is to be temperate, nonargumentative, scrupulously fair, and not to usurp the jury's function. (*Harris*, *supra*, 37 Cal.4th at p. 350.) Defendant argues the trial court's comment about wrongdoers was improper, because the plain import was that the court deemed defendant -- the only person who was on trial -- a wrongdoer who should be found guilty. Defendant argues that, even though the court said it was a little joke, the comment was so directed and pointed that the jury surely must have concluded the court believed its comment had some truth. Defendant argues the timing of this "inflammatory comment" exacerbated its prejudicial effect, because it was made right after the defense toxicologist testified and right before Dr. Pittel testified, and the jury could have concluded the trial court had a negative view of the witnesses or the defense.

Defendant makes much ado about nothing. The trial court's comment was not intemperate, argumentative, or unfair and it did not usurp the jury's function.

Moreover, defendant fails to show that counsel's performance was deficient because it fell below an objective standard of reasonableness or that there could be no reasonable explanation for trial counsel's failure to object in the trial court. (*Strickland*, *supra*, 466 U.S. at pp. 687-688; *People v. Ledesma* (2006) 39 Cal.4th 641, 746.) One obvious explanation is that the trial court explained the joke to trial counsel's satisfaction. Another obvious explanation is that there was nothing to object about.

Though we need not go further, we note the court gave the standard jury instruction not to take anything the judge said as evidence that the judge thought one way or the other about any of the facts, witnesses, evidence, or verdict. We presume the jury

followed the instructions.  (*Gray*, *supra*, 37 Cal.4th at p. 231.)  Defendant has not shown prejudice.

## IV.  Claim of Cumulative Error

Defendant claims the cumulative effect of prosecutorial misconduct and trial court errors compels a finding of prejudice warranting reversal.  (*People v. Jasso* (2012) 211 Cal.App.4th 1354, 1378.)  We have reviewed all of defendant's claims and find no cumulative prejudicial error warranting reversal.

## DISPOSITION

The judgment is affirmed.


               MURRAY       , J.


We concur:


     RAYE       , P. J.


     MAURO      , J.